Louis S. CAIOLA, Plaintiff–Appellant,

v.

CITIBANK, N.A., NEW YORK, Defendant–Appellee.

Docket No. 01–7545.

United States Court of Appeals, Second Circuit.

Argued: Feb. 14, 2002.

Decided: June 27, 2002.

Philip C. Korologos, (David Boies, Eric Brenner, on the brief), Boies, Schiller &

Flexner, Armonk, NY, for plaintiff-appellant, Louis S. Caiola.

Rory O. Millson, (Thomas G. Rafferty, on the brief), Cravath, Swaine & Moore, New York City, for defendant-appellee, Citibank, N.A., New York.

BEFORE: SACK, B.D. PARKER, and GIBSON,* Circuit Judges.

B.D. PARKER Jr., Circuit Judge.

Plaintiff–appellant Louis S. Caiola brought federal securities fraud and state law claims against defendant-appellee Citibank, N.A., New York arising from extensive physical and synthetic investments. The District Court (Denise L. Cote, *Judge* ) granted Citibank's motion to dismiss the Complaint under Federal Rule of Civil Procedure 12(b)(6), finding that Caiola lacked standing under Rule 10b–5 to allege a violation of section 10(b) of the Securities Exchange Act of 1934 (the "1934 Act") because he was not a purchaser or seller of securities, his synthetic transactions were not "securities" as defined by the 1934 Act, and he failed to plead material misrepresentations. The District Court declined to exercise supplemental jurisdiction over Caiola's state law claims. *Caiola v. Citibank, N.A.*, 137 F.Supp.2d 362 (S.D.N.Y.2001). Caiola appealed. We find that Caiola sufficiently alleged both purchases and sales of securities and material misrepresentations for purposes of Rule 10b–5 and therefore reverse and remand.

## BACKGROUND

Because the Complaint was dismissed under Rule 12(b)(6), we accept its factual allegations for purposes of this appeal. *See Kalnit v. Eichler*, 264 F.3d 131, 135 (2d Cir.2001). The allegations in the Complaint are as follows. Caiola, an entrepreneur and sophisticated investor, was a major client of Citibank Private Bank, a division of Citibank, from the mid–1980s to September 1999. (Compl.¶¶ 29–31, 149.) During this relationship, Citibank assisted Caiola with a wide range of business and personal financial services. (*Id.* ¶ 32.) As a result of these transactions, which involved hundreds of millions of dollars, Caiola became one of Citibank's largest customers. (*Id.* ¶¶ 34–37.)

Beginning in the mid–1980s, Caiola undertook high volume equity trading, entrusting funds to Citibank who in turn engaged various outside brokerage firms. (*Id.* ¶ 38.) Caiola specialized in the stock of Philip Morris Companies, Inc. ("Philip Morris") and regularly traded hundreds of thousands of shares valued at many millions of dollars. (*Id.* ¶¶ 4, 39.) To hedge the risks associated with these trades, Caiola established option positions corresponding to his stock positions. (*Id.* ¶ 39.)

As Caiola's trades increased in size, he and Citibank grew increasingly concerned about the efficacy of his trading and hedging strategies. Caiola's positions required margin postings of tens of millions of dollars and were sufficiently large that the risks to him were unacceptable unless hedged. (*Id.* ¶¶ 8, 40, 55.) But the volume of options necessary to hedge effectively could impact prices and disclose his positions—effects known as "footprints" on the market. (*Id.* ¶¶ 8, 74.) In early 1994, Citibank proposed synthetic trading. (*Id.* ¶¶ 41, 57.) A synthetic transaction is typically a contractual agreement between two counterparties, usually an investor and a bank, that seeks to economically replicate the ownership and physical trading of

---

* Hon. John R. Gibson of the United States Court of Appeals for the Eighth Circuit, sitting by designation.

shares and options. (*Id.* ¶ 42.) The counterparties establish synthetic positions in shares or options, the values of which are pegged to the market prices of the related physical shares or options. (*Id.* ¶¶ 4, 43.) The aggregate market values of the shares or options that underlie the synthetic trades are referred to as "notional" values and are treated as interest-bearing loans to the investor. (*Id.* ¶ 43.) As Citibank explained to Caiola, synthetic trading offers significant advantages to investors who heavily concentrate on large positions of a single stock by reducing the risks associated with large-volume trading. (*Id.* ¶¶ 5–6, 55.) Synthetic trading alleviates the necessity of posting large amounts of margin capital and ensures that positions can be established and unwound quickly. (*Id.* ¶¶ 6, 56(f).) Synthetic trading also offers a solution to the "footprint" problem by permitting the purchase of large volumes of options in stocks without affecting their price. (*Id.* ¶ 56(b).)

Taking Citibank's advice, Caiola began to engage in two types of synthetic transactions focusing on Philip Morris stock and options: equity swaps and cash-settled over-the-counter options. (*Id.* ¶ 44.) In a typical equity swap, one party (Caiola) makes periodic interest payments on the notional value of a stock position and also payments equal to any decrease in value of the shares upon which the notional value is based. *See* Note, *Tax–Exempt Entities, Notional Principle Contracts, and the Unrelated Business Income Tax*, 105 Harv. L.Rev. 1265, 1269 (1992). The other party (Citibank) pays any increase in the value of the shares and any dividends, also based on the same notional value. *See id.*

For example, if Caiola synthetically purchased 1000 shares of Philip Morris at $50 per share, the notional value of that transaction would be $50,000. Because this notional value would resemble a loan from Citibank, Caiola would pay interest at a predetermined rate on the $50,000. If Philip Morris's stock price fell $10, Caiola would pay Citibank $10,000. If the stock price rose $10, Citibank would pay Caiola $10,000. Citibank also would pay Caiola the value of any dividends that Caiola would have received had he actually owned 1000 physical shares.

Caiola also acquired synthetic options, which were cash-settled over-the-counter options. (Compl.¶ 44.) Because these options were not listed and traded on physical exchanges, their existence and size did not impact market prices. (*Id.* ¶¶ 55(a), (b), 74.) Caiola and Citibank agreed to terms regarding the various attributes of the option in a particular transaction (such as the strike price, expiration date, option type, and premium). They agreed to settle these option transactions in cash when the option was exercised or expired, based on the then-current market price of the underlying security. (*Id.* ¶¶ 69(g), 101(a).)

Caiola and Citibank documented their equity swaps and synthetic options through an International Swap Dealers Association Master Agreement ("ISDA Agreement")[1] dated March 25, 1994. The ISDA Agreement established specific terms for the synthetic trading. (*Id.* ¶ 63.) After entering into the ISDA Agreement, Caiola, on Citibank's advice, began to enter into "coupled" synthetic transactions with Citibank. (*Id.* ¶ 47.) Specifically, Caiola's over-the-counter option positions

---

**1.** The International Swap Dealers Association, now known as the International Swap and Derivatives Association, is a global trade association that developed a master agreement for interest rate and currency exchange swaps. *See First Nat'l Bank of Chicago v. Ackerley Communications, Inc.*, 2001 WL 15693, at *4 n. 3, (S.D.N.Y. 2001)2001 U.S.Dist. LEXIS 20895, at *13 n. 3.

were established in connection with a paired equity swap, ensuring that his synthetic options would always hedge his equity swaps. This strategy limited the amount he could lose and ensured that his risks would be both controllable and quantifiable. (*Id.* ¶ 6.)

Citibank promised Caiola that as · his counterparty it would control its own risks through a strategy known as "delta hedging." (*Id.* at ¶ 45.) Delta hedging makes a derivative position, such as an option position, immune to small changes in the price of an underlying asset, such as a stock, over a short period of time. *See* John C. Hull, *Options Futures, and Other Derivatives* 311–12 (4th ed.2000). The "delta" measures the sensitivity of the price of the derivative to the change in the price of the underlying· asset. *Id.* at 310. Specifically, "delta" is the ratio of the change in the price of the derivative to that of the underlying asset. *Id.* Thus, if an option has a delta of .5, a $1 change in the stock price would result in a $.50 change in the option price. Caiola's synthetic positions contained a number of components, such as a stock position plus one or more option positions. For each of these coupled or integrated transactions a "net delta" was calculated which helped Citibank determine the amount of securities necessary to establish its "delta core" position. (Compl.¶ 48.) By maintaining a "delta core" position in the physical market, Citibank could achieve "delta neutrality," a hedge position that would offset Citibank's obligations to Caiola. (*Id.* ¶¶ 47–49.)

Effective delta hedging is a sophisticated trading activity that involves the .continuous realignment of the hedge's portfolio. Because the delta changes with movements in the price of the underlying asset, the size of the delta core position also constantly changes. (*Id.* ¶ 50.) Although

a certain delta core position ˙might sufficiently hedge Citibank's obligations at one point, a different delta core position may become necessary a short time later. *See* Hull, *supra*, at 310–11. Thus, as markets fluctuate, the net delta must be readjusted continuously to ensure an optimal exposure to risk. *Id.;* Adam R. Waldman, Comment, *OTC Derivatives & Systemic Risk: Innovative Finance or the Dance into the Abyss?*, 43 Am.U.L.Rev. 1023, 1044 (1994). Citibank told Caiola that as his˙ counterparty it would continuously adjust its delta core positions to maintain delta neutrality. (Compl.¶ 50.) Also, Caiola routinely altered his transactions to account for their effect on Citibank's delta core positions. (*Id.* ¶ 51.) This arrangement was satisfactory so long as Citibank adhered to its delta hedging strategy, which involved comparably small purchases in the physical market. However, if Citibank fully replicated Caiola's stock and option positions in the physical market instead of delta hedging, the benefits of synthetic trading would disappear and he would be exposed to risks that this strategy was designed to avoid. (*Id.* ¶ 54–55.)

Each synthetic transaction was governed by an individualized confirmation containing a number of disclaimers. (*Id.* ¶ 64.) A confirmation for Caiola's purchase of 360,000 cash-settled over-the-counter options dated December 9, 1998 ("Confirmation"), for instance, provides that each party represents to the other that "it is not relying on any advice, statements or· recommendations (whether writ-̇ten or oral) of the other party," that each is entering the transaction "as principal and not as an agent for [the] other party," and that "[Caiola] acknowledges and agrees that [Citibank] is not acting as a fiduciary or advisor to [him] in connection with this Transaction." (Confirmation ¶ 9(a).) Further, the ISDA .Agreement and accompanying Schedule, which gov-

erned the overall synthetic relationship, provides:

> This Agreement constitutes the entire agreement and understanding of the parties with respect to its subject matter and supersedes all oral communication and prior writings with respect thereto. (ISDA Agreement ¶ 9(a).)
>
> [Caiola] has such knowledge and experience in financial, business and tax matters that render him capable of evaluating the merits and risks of this Agreement and the Transactions contemplated hereunder; [Caiola] is able to bear the economic risks of this Agreement and the Transaction contemplated hereunder; and, after appropriate independent investigations, [Caiola] has determined that this Agreement and the Transactions contemplated hereunder are suitable for him.... (ISDA Agreement, Schedule to the Master Agreement, Part 5, ¶ 2(a)(ii).)

In October 1998, Citicorp, Citibank's parent company, merged with Travelers Group, Inc. ("Travelers"). (Compl.¶ 80.) Caiola feared that Salomon Smith Barney ("SSB"), a Travelers affiliate, might become involved in his account. (*Id.* ¶ 82.) At a November 18, 1998 meeting, Citibank informed Caiola that SSB would become involved in Caiola's synthetic equities trading. (*Id.* ¶ 81.) At this meeting, Caiola stated that he did not wish to become a client of SSB and that, unless his relationship with Citibank were to continue as it had previously existed, he would terminate it. (*Id.* ¶¶ 82, 83.) Citibank assured Caiola then and subsequently that their relationship would continue unchanged and, specifically, that his synthetic trading relationship with Citibank would remain unaltered by SSB's involvement. (*Id.* ¶¶ 84, 85.)

Relying on these assurances, Caiola maintained his account at Citibank and continued to establish sizeable positions with the understanding that they would be managed synthetically, with Citibank continuing to serve as the delta hedging counterparty. (*Id.* ¶¶ 91–92, 97.) From January 1999 through March 1999, Caiola bought and sold more than twenty-two million options, established a swap position involving two million shares of Philip Morris stock with a notional value of eighty million dollars, and paid Citibank millions of dollars in commissions and interest. (*Id.* ¶ 96.)

However, after November 1998, and contrary to its representations and unknown to Caiola, Citibank had secretly stopped delta hedging and transformed Caiola's synthetic portfolio into a physical one by executing massive trades in the physical markets that mirrored Caiola's synthetic transactions. (*Id.* ¶¶ 103, 108.) In other words, when Caiola sought to open an integrated synthetic position in shares of synthetic stock and synthetic options, Citibank, instead of delta hedging, simply executed physical trades on stock and options.[2] These transactions, Caiola alleges, exposed him to the risks—"foot-

---

2. Caiola offers the following illustration:

 For example, on March 9, 1998[sic], Mr. Caiola submitted an order to establish a synthetic position consisting of (i) a long position in 2 million notional shares of Philip Morris stock; (ii) a long position in 2 million synthetic Philip Morris put options, and (iii) a short position in 2 million synthetic Philip Morris call options. Had Citibank still been delta hedging, it would only have needed to purchase approximately 100,000 shares of Philip Morris stock to adjust its delta core position as a result of this transaction. But, as publicly available trading records reveal, Citibank actually bought huge quantities of real physical options on the American Option Exchange in order to open this position. (Compl.¶ 109.)

prints" and a lack of liquidity—that synthetic trading was intended to avoid. (*Id.* ¶ 113.)

On March 12, 1999, Citibank told Caiola that it intended to early exercise certain options in his portfolio for physical settlement, a demand inconsistent with a synthetic relationship. (*Id.* ¶ 116.) One week later Citibank for the first time refused to establish a synthetic option position Caiola requested. (*Id.* ¶ 118.) Growing concerned, on March 26, 1999, Caiola inquired and was told that SSB was unwilling to assume the risks associated with synthetic trading. (*Id.* ¶ 121.) During this time period, although Caiola had taken a large position in Philip Morris stock that was declining in value, he wrote options expecting to recoup his losses and to profit from an anticipated rise in the value of the shares. (*Id.* ¶¶ 122–23.) The strategy, Caiola claims, failed because Citibank had secretly and unilaterally terminated synthetic trading. (*Id.* ¶ 125.) This termination cost Caiola tens of millions of dollars because the price of Philip Morris rebounded as he had expected. (*Id.* ¶ 126.)

At this point, Caiola investigated and discovered that Citibank had ceased treating his investments synthetically as early as November 1998. (*Id.* ¶ 127.) Two Citibank officers informed Caiola that "many" of his trades had been executed on the physical market, although they had been submitted and accepted by Citibank as synthetic transactions. (*Id.* ¶ 135.) The only explanation Caiola received was that "[t]his is how SSB wanted it done." (*Id.* ¶ 136.)

Caiola unearthed additional evidence that Citibank had transformed his portfolio when he attempted to unwind his account in September 1999. (*Id.* ¶¶ 149–50.) When Caiola placed unwind transactions, Citibank refused to execute the trades without a commission—a further indication to Caiola that what he thought were synthetic positions were being handled by Citibank as physical transactions. (*Id.* ¶ 151.) In addition, as Citibank executed certain option transactions during this unwind period, Citibank sent Caiola confirmations reflecting that the transactions were for physical, instead of cash, settlement. (*Id.* ¶ 152.) Caiola also was told by a Citibank official that it was holding hundreds of thousands of physical shares of Philip Morris stock in his account and that Citibank had executed certain unwind transactions by going to the physical market to sell millions of options and shares. (*Id.* ¶ 153–54.) Finally, when Citibank failed to completely unwind a certain swap position, it told Caiola that hundreds of thousands of physical shares—for which he had no hedge protection and was financially responsible—were being sold on his behalf. (*Id.* ¶ 157.)

In July 2000, Caiola sued Citibank alleging violations of section 10(b) and Rule 10b–5. He also asserted state law claims for fraud, breach of fiduciary duty, and breach of contract. Generally, the Complaint alleged that Citibank violated section 10(b) and Rule 10b–5 when it misrepresented that it would continue its pre-existing synthetic trading relationship but secretly abandoned its role as delta hedging counterparty and, instead, bought and sold exchange-traded stock and options on Caiola's behalf (*Id.* ¶¶ 110–02, 108.) Caiola further claims that Citibank's misrepresentations were material, he relied on them, and, as a result, he experienced massive losses.

Citibank moved to dismiss under Rule 12(b)(6) on the grounds that Caiola was neither a purchaser nor a seller of securities, that the synthetic transactions were not "securities," and that the confirmations established that neither party was entitled to rely on the representations of the other.

*See* Fed.R.Civ.P. 12(b)(6). The District Court granted Citibank's motion. *Caiola v. Citibank, N.A.,* 137 F.Supp.2d 362, 367–73 (S.D.N.Y.2001).

Applying agency principles, the District Court reasoned that, while Caiola did not allege that he purchased securities, "he asserts that Citibank, acting improperly as his 'broker-agent' and without his knowledge or consent, replicated his synthetic swaps on the physical market *for Caiola's account.*" *Id.* at 368 (emphasis in original). But, according to the District Court,

> Caiola has not alleged that he consented to have Citibank act as his agent in purchasing or selling securities, nor does Caiola assert that Citibank could reasonably have inferred that it had such authority. Rather, Caiola asserts that Citibank's actions had the effect of unilaterally establishing itself as Caiola's agent. These assertions are insufficient to create an agency relationship.

*Id.* Accordingly, the District Court concluded that, because Citibank was not Caiola's agent, its own purchases and sales of securities did not make Caiola a purchaser or seller of securities. *Id.* at 369.

The District Court next held that Caiola was not a purchaser or seller of securities because his synthetic transactions did not constitute "securities" as defined by section 3(a)(10) of the 1934 Act. *See* 15 U.S.C. § 78c(a)(10) (2000). Relying on *Procter & Gamble Co. v. Bankers Trust Co.,* 925 F.Supp. 1270 (S.D.Ohio 1996), the court concluded that Caiola's synthetic transactions "were not options on securities since 'they did not give either counterparty the right to exercise an option or to take possession of any security.'" *Caiola,* 137

F.Supp.2d at 370 (quoting *Procter & Gamble,* 925 F.Supp. at 1282).

The District Court also concluded that Caiola failed to sufficiently plead material misrepresentations. *Id.* at 372–73. Apparently resting its analysis on parol evidence principles, the District Court determined that the oral misrepresentations alleged by Caiola were not actionable because they conflicted with written representations in the ISDA Agreement and the Confirmation.

> In his complaint, Caiola attributes several misrepresentations to Citibank that contradict unambiguous language in the ISDA Agreement and the Confirmation. Caiola asserts that Citibank misrepresented in November 1998, that "its synthetic trading relationship would not change" when, in fact, it "intended to begin replicating Mr. Caiola's positions through transactions in physical securities on the physical market." In the Confirmation, however, Citibank and Caiola agreed that they were "not relying on any advice, statements or recommendations (whether written or oral) of the other party" regarding the transaction. According to the terms of the ISDA Agreement and the Confirmation, Citibank was under no obligation to advise Caiola about its investment strategy or hedge Caiola's investments in a particular way. Because the oral misrepresentations allegedly made by Citibank directly conflict with unambiguous language in the Confirmation, the language in the Confirmation controls and the misrepresentations alleged in the complaint can be disregarded.

*Id.* at 372.[3]

Finally, the District Court concluded that Citibank's decision to exercise an op-

---

**3.** The District Court reached a similar conclusion with respect to Caiola's allegation that

Citibank misrepresented that it would act as his fiduciary:

tion early and its refusal to engage in additional synthetic transactions were not actionable because "Citibank had the contractual right to take these actions, and the reasoning behind Citibank's decision to take these actions would not reasonably affect an investor's decisionmaking." *Id.* at 373. Accordingly, the District Court dismissed the federal securities fraud claims and declined to exercise supplemental jurisdiction over the state law claims. *Id.* at 374. Caiola appealed.

## DISCUSSION

■ We review *de novo* the District Court's dismissal of the Complaint. *See Grandon v. Merrill Lynch & Co.,* 147 F.3d 184, 188 (2d Cir.1998). Dismissal is proper only if, after accepting all the allegations in the Complaint as true and drawing all reasonable inferences in Caiola's favor, the Complaint fails to allege any set of facts that would entitle him to relief. *See Chambers v. Time Warner, Inc.,* 282 F.3d 147, 152 (2d Cir.2002). In other words, dismissal under Rule 12(b)(6) "is not warranted unless it appears beyond doubt that

the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.". *Woodford v. Cmty. Action Agency of Greene County, Inc.,* 239 F.3d 517, 526 (2d Cir.2001) (citations and internal quotation marks omitted).

### I. Standing Under Rule 10b-5

■ Caiola alleges that Citibank committed securities fraud in violation of section 10(b) and Rule 10b-5.[4] The elements of such a claim are well-established. A plaintiff must allege " 'that in connection with the purchase or sale of securities, the defendant, acting with scienter, made a false material representation or omitted to disclose material information and that plaintiff's reliance on defendant's conduct caused [plaintiff] injury.' " *In re Time Warner Inc. Sec. Litig.,* 9 F.3d 259, 264 (2d Cir.1993) (alteration in original) (quoting *Bloor v. Carro, Spanbock, Londin, Rodman & Fass,* 754 F.2d 57, 61 (2d Cir. 1985)); *accord Suez Equity Investors, L.P. v. Toronto–Dominion Bank,* 250 F.3d 87, 95 (2d Cir.2001). Citibank argues that the Complaint fails to allege two of these ele-

---

Caiola also asserts that Citibank misrepresented that it would act as his fiduciary. The Confirmation explicitly states, however, that Citibank would *not* act as his fiduciary. For the same reasons stated above, parol evidence is inadmissible as a matter of law to contradict the terms of an unambiguous agreement. *Caiola,* 137 F.Supp.2d at 373 (emphasis in original).

4. Section 10(b) makes it unlawful for any person

[t]o use or employ, in connection with the purchase or sale of any security ... any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [Securities and Exchange] Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j(b) (2000). Acting pursuant to its regulatory authority conferred by section 10(b), the Securities and Exchange Com-

mission promulgated Rule 10b-5, which provides,

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

(a) To employ any device, scheme or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statement made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5 (2001).

ments: a purchase or sale of securities and reliance. The District Court found the Complaint's allegations of materiality insufficient, but Citibank does not defend this conclusion on appeal.

### A. The Purchase or Sale of Securities

■ Under the first element—fraud committed "in connection with the purchase or sale of any security"—standing is limited to actual purchasers or sellers of securities. *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 749, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975); *Gurary v. Winehouse*, 190 F.3d 37, 46 n. 9 (2d Cir. 1999). The District Court concluded that Caiola was not a purchaser or seller of securities because Citibank did not act as his agent in purchasing or selling physical securities and because the synthetic transactions were not "securities." *Caiola*, 137 F.Supp.2d at 368–72.

Caiola argues that the Complaint alleges that he is a purchaser and seller of securities in two different ways. First, he argues that the District Court overlooked the Complaint's allegations that Citibank bought and sold physical stock and options on his behalf. Second, he argues that, apart from Citibank's physical transactions, for which Citibank ostensibly held him responsible and which confer standing, both cash-settled over-the-counter options and equity swaps are covered by the 1934 Act.

#### 1. Citibank's Purchases and Sales of Physical Securities

■ Caiola alleges that beginning in November 1998 Citibank purchased and sold physical stock and options in his account and on his behalf. According to Citibank, it made these purchases and sales on its own behalf in order to hedge its risks on Caiola's synthetic transactions. The distinction is significant because if the

transactions were for Caiola's account, he has standing. *See Gurary*, 190 F.3d at 46 n. 9.

The Complaint is replete with allegations that Citibank purchased and sold securities for Caiola in his account:

Citibank told Mr. Caiola that he, not Citibank, bore the risk associated with Citibank's inability to unwind his "Swap 2" position and therefore Mr. Caiola *held hundreds of thousands of physical shares* of Philip Morris stock.... (Compl.¶ 114(d) (emphasis added).)

Citibank's conduct in executing these transactions unequivocally confirmed that Citibank had, from November 1998 through March 1999, completely *transformed Mr. Caiola's portfolio from a synthetic, into a physical portfolio*, acting as his agent and not as a principal, entirely without Mr. Caiola's authorization. (*Id.* ¶ 150 (emphasis added).)

Citibank expressly told Mr. Caiola that it *held hundreds of thousands of physical shares of Philip Morris stock in his account.* (*Id.* ¶ 153 (emphasis added).)

[W]hen Citibank did not completely unwind the entire Swap 2 position, it told Mr. Caiola that the hundreds of thousands of physical shares that it was selling naked were his problem, and *these shares were physical shares held on his behalf* that he was responsible for without any hedge protection. (*Id.* ¶ 157 (emphasis added).)

[E]ven though Mr. Caiola's synthetic investment strategy was designed so that Mr. Caiola did not need to account for such risks, these are precisely the risks that Citibank imposed on him on September 27, 1999, when *Mr. Caiola was told that hundreds of thousands of Philip Morris stock [sic] were being sold on his behalf* without any hedge protection whatsoever. (*Id.* ¶ 160 (emphasis added).)

Admittedly, other allegations in the Complaint suggest that Citibank bought and sold the physical stock and options as part of its own hedging strategy. For example, Caiola alleges that "Citibank and/or its agents began to buy and sell on the physical exchanges millions of options that were the same options in which Mr. Caiola had synthetic positions." (*Id.* ¶ 17.) Elsewhere, Caiola alleges that "after SSB became involved in handling Mr. Caiola's transactions after the Citicorp/Travelers merger, Citibank acted to replicate Mr. Caiola's integrated synthetic positions with real physical stock and options." (*Id.* ¶ 108.)

These ambiguous allegations could mean either that Citibank used Caiola's funds to trade physically, instead of synthetically, or that Citibank hedged Caiola's trades by engaging in physical transactions replicating Caiola's synthetic ones. The former interpretation incontrovertibly would give rise to standing under Rule 10b–5. *See Sec. Investor Prot. Corp. v. Vigman,* 803 F.2d 1513, 1519 (9th Cir.1986) (holding that "when a broker makes an unauthorized purchase or sale of securities with his customer's assets, that purchase or sale may be attributed to the customer for purposes of satisfying" standing under Rule 10b–5). The latter interpretation is less certain. In any event, Rule 12(b)(6) obligates us at this point to draw all reasonable inferences in Caiola's favor. *See Chambers,* 282 F.3d at 152. Under this standard, Caiola's Complaint sufficiently alleges that he was a purchaser and seller of securities. We thus need not and do not decide whether Rule 10b–5 standing would be satisfied under the second theory.

■ The District Court nonetheless dismissed Caiola's claims because it concluded that Caiola did not allege that Citibank had acted as his agent in purchasing and selling physical securities. *Caiola,* 137 F.Supp.2d at 368–69. Specifically, it held that the requisite agency relationship was lacking because "Caiola has not alleged that he consented to have Citibank act as his agent in purchasing or selling securities, nor does Caiola assert that Citibank could reasonably have inferred that it had such authority." *Id.* at 368. This conclusion is incorrect, as the Complaint adequately alleges that Citibank, acting as Caiola's "broker-agent," bought physical stock on Caiola's behalf and for his account, albeit without his authorization. (Compl.¶ 110.)

■ The fact that Caiola did not authorize Citibank to engage in the physical transactions does not deprive Caiola of standing. Indeed, it is well-settled that claims under Rule 10b–5 arise when brokers purchase or sell securities on their clients' behalf without specific authorization. For example, a claim for unauthorized trading, which occurs when a broker intentionally places trades without obtaining the customer's approval, historically has been well-established under Rule 10b–5. *E.g., Sec. Investor Prot. Corp.,* 803 F.2d at 1519 (holding that plaintiff adequately pleaded unauthorized trading where broker defendants allegedly made unauthorized transactions in customers' accounts as part of a stock market manipulation scheme); *Cruse v. Equitable Sec. of N.Y., Inc.,* 678 F.Supp. 1023, 1028–30 (S.D.N.Y.1987) (holding that plaintiff sufficiently pleaded, for Rule 12(b)(6) purposes, unauthorized trading arising from broker's purchases and sales for plaintiff's account, but dismissing claims under Federal Rule of Civil Procedure 9(b) for insufficient particularity); *Jaksich v. Thomson McKinnon Sec., Inc.,* 582 F.Supp. 485, 492–95 (S.D.N.Y.1984) (finding section 10(b) and Rule 10b–5 violations where defendant broker purchased and sold stock without

plaintiff customer's authorization). By definition, a broker who is liable for making unauthorized trades makes them without the customer's authorization. Churning claims, which depend on a broker's liability for excessive trading, also have been recognized under Rule 10b–5. *See Saxe v. E.F. Hutton & Co., Inc.,* 789 F.2d 105, 112 (2d Cir.1986) ("Churning occurs when an account has been excessively traded to generate commissions in contravention to the investor's expressed investment goals."); *see also Armstrong v. McAlpin,* 699 F.2d 79, 90–92 (2d Cir.1983); *Nilsen v. Prudential–Bache Sec.,* 761 F.Supp. 279, 289–90 (S.D.N.Y.1991).

As with unauthorized trading or churning claims, the key fact is that Caiola has alleged that the purchases were made on his behalf, not that they were specifically authorized. Because we may reasonably infer from the Complaint that Citibank purchased physical shares and options with Caiola's funds and on his behalf, Caiola has sufficiently alleged the purchase or sale of securities.

### 2. Synthetic Transactions as Securities

The District Court also concluded—without distinguishing between options and swaps—that Caiola failed to allege the purchase or sale of a security because his synthetic transactions were not "securities." The District Court analyzed Caiola's options in light of the conventional understanding that "[a]n option contract 'entitles a purchaser to buy or sell a commodity by some specific date at a fixed price known as the "strike price" .... ' " *Caiola,* 137 F.Supp.2d at 370 (quoting *United States v. Bein,* 728 F.2d 107, 111 (2d Cir.1984)). The District Court believed that no court previously had considered "whether the types of transactions at issue in this case constitute securities, although in [*Procter & Gamble* ], the court

held that certain interest rate swap contracts were not 'securities.' " *Id.* at 369. The court concluded that "for many of the same reasons offered in *Procter and Gamble,* the transactions at issue were not 'securities.' " *Id.* In particular, the District Court held that Caiola's synthetic transactions did not fit the definition of "securities" in section 3(a)(10) of the 1934 Act because they were not investment contracts, notes, or evidence of indebtedness. *Id.* at 369–70. The court also held that the synthetic transactions were not "options on securities" as defined by that section because, drawing on *Procter & Gamble,* " 'they did not give either counterparty the right to exercise an option or to take possession of any security.' " *Id.* at 370 (quoting *Procter & Gamble,* 925 F.Supp. at 1282).

Caiola's synthetic transactions, however, involved two distinct instruments: cash-settled over-the-counter options and equity swaps. The two must be analyzed separately. We conclude that Caiola's synthetic options are "securities" subject to section 10(b). Caiola does not argue on appeal that his equity swaps met the definition of a security under section 3(a)(10) at the time of his trades, but instead urges us to apply retroactively the Commodities Futures Modernization Act of 2000 ("CFMA"), Pub.L. No. 106–554, 114 Stat. 2763 (2000). Because Caiola did not adequately raise this issue before the District Court, we decline to consider it on appeal.

### a. Cash–Settled Over–the–Counter Options

■ The anti-fraud provisions of the federal securities laws cover options on securities. Section 3(a)(10) of the 1934 Act defines "security" to include "any put, call, straddle, option, or privilege on any security, certificate of deposit, or group or index of securities (including any interest therein

or based on the value thereof)...." 15 U.S.C. § 78c(a)(10) (2000). Citibank contends that this definition of "security" does not include all options without limitation. Citibank argues that only an option on a security would be covered, not an option based on the value of a security. In other words, according to Citibank, an option that involves the right to take possession of a security fits the statutory definition but a synthetic option that merely obligates the counterparty to make cash payments based on the value of a security does not. The District Court agreed with this analysis. *Caiola*, 137 F.Supp.2d at 370–72. Caiola, on the other hand, alleges that his synthetic options were simply cash-settled over-the-counter options on Philip Morris stock and therefore are securities. We agree that these instruments are securities under section 3(a)(10) for a number of reasons.

The Confirmation, on which Citibank relies for its argument that Caiola's options are not securities, indicates that the transactions are commonly used cash-settled over-the-counter options. The Confirmation expressly states that the "particular Transaction to which this Confirmation relates is an Option" and the "Type of Transaction" is an "Equity Option" on the "common stock of Philip Morris Cos." Options have been covered under section 10(b) since the 1934 Act was amended in 1982. Securities Exchange Act of 1934 Amendments of 1982, Pub.L. No. 97–303, 96 Stat. 1409 (1982). The parties dispute whether cash-settled over-the-counter options on the value of a security are covered by section 10(b). We hold that they are.

The Supreme Court has cautioned that "[i]n searching for the meaning and scope of the word 'security' ... the emphasis should be on economic reality." *United Hous. Found. v. Forman*, 421 U.S. 837, 848, 95 S.Ct. 2051, 44 L.Ed.2d 621 (1975) (quoting *Tcherepnin v. Knight*, 389 U.S. 332, 336, 88 S.Ct. 548, 19 L.Ed.2d 564 (1967)). The definition of security is construed in a "flexible" manner, so as to "meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits." *SEC v. W.J. Howey Co.*, 328 U.S. 293, 299, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946). In this way, the economic reality approach "permit[s] the SEC and the courts sufficient flexibility to ensure that those who market investments are not able to escape the coverage of the Securities Acts by creating new instruments that would not be covered by a more determinate definition." *Reves v. Ernst & Young*, 494 U.S. 56, 63 n. 2, 110 S.Ct. 945, 108 L.Ed.2d 47 (1990).

Under section 3(a)(10) "security" includes (i) an option on any "security," (ii) an option on any "certificate of deposit," and (iii) an option on any "group or index of securities." Therefore, "option" under section 3(a)(10) is not limited to "conventional" exchange-traded options. It applies to both exchange-traded as well as over-the-counter options and does not distinguish between physically-settled and cash-settled options.[5] Nor does the definition distinguish between options documented as swaps as opposed to options documented in some other fashion.

We find further support for our conclusion in section 3(a)(10)'s definition of "secu-

---

5. Moreover, "[d]ata from [options exchanges] show that the vast majority of options are closed in the secondary market rather than exercised or allowed to expire." 2 Louis Loss & Joel Seligman, *Securities Regulation* 1138.3 (3d ed.1999). A definition of "options" that excluded cash-settled options thus would exclude many instruments whose use is prevalent in contemporary financial markets.

rity" to include an option on any "group or index of securities." An option on a security can be physically settled by delivery of physical stock. An index of securities, however, is simply a benchmark against which financial performance is measured. An option on an index of securities is settled by cash since physical delivery is not possible. *See* 5 Louis Loss & Joel Seligman, *Securities Regulation* 2650 (3d ed.1999). Consequently, the right to take possession does not define an "option" under section 3(a)(10), which covers options that can be physically delivered as well as those that cannot.

Both the District Court and Citibank rely heavily on *Procter & Gamble* for their conclusion that cash-settled over-the-counter options are not securities. *Procter & Gamble*, however, held that a very different type of transaction—swaps linked to the price of Treasury notes—were not securities. The plaintiff in *Procter & Gamble* argued that even though the instrument in question was technically an interest rate swap, it had option-like features and thus could be characterized as an "option on a security" under section 3(a)(10). *Procter & Gamble*, 925 F.Supp. at 1280–81. The court, however, rejected this argument because the swap "did not give either counterparty the right to exercise an option or to take possession of any security." *Id.* at 1282. The District

Court imported this language from *Procter & Gamble*, finding it dispositive. *Caiola*, 137 F.Supp.2d at 370 (quoting *Procter & Gamble*, 925 F.Supp. at 1282). Unlike the plaintiff's argument in *Procter & Gamble* that an interest rate swap with option-like features could be characterized as an option on a security, Caiola's transactions involve the much more straightforward question of whether a cash-settled over-the-counter option on Philip Morris stock—similar to options commonly traded on the market—is an option on a security. *Procter & Gamble* does not address this issue.[6]

■ Further, *Procter & Gamble* concluded that a critical feature of an option was the right to exercise and to take possession of the security because the parenthetical "based on the value thereof" in section 3(a)(10) applied only to the immediately preceding phrase, "group or index of securities" and not to "any security." *Procter & Gamble*, 925 F.Supp. at 1281–82. We believe this conclusion is incorrect, and we decline to follow its lead. We hold that the parenthetical applies to "any security." The text of the statute itself includes cash-settled options by defining "option" to include an option on a "group or index of securities." This provision is sufficiently clear that a resort to legislative history is not necessary.[7] *See Lee v. Bankers Trust*

---

6. Significantly, *Procter & Gamble's* holding was quite narrow:

> It is important to point out that the holdings in this case are narrow; I do not determine that all leveraged derivative transactions are not securities, or that all swaps are not securities. Some of these derivative instruments, because of their structure, may be securities.

*Procter & Gamble*, 925 F.Supp. at 1283.

7. The District Court examined the CFMA and its legislative history for insight into the status of Caiola's transactions, which were entered into prior to the enactment of the CFMA.

Because section 3(a)(10) is clear, that inquiry was unnecessary. In any event, we disagree with the District Court's conclusion that Caiola's options were "security based swap agreements" exempted from the CFMA's definition of security. *Caiola*, 137 F.Supp.2d at 371–72. The CFMA provides that a "swap agreement" is not a security under section 3(a)(10) of the 1934 Act. CFMA § 303, 114 Stat. at 2763A–452–57. However, section 301 of the CFMA excludes from the definition of "swap agreement" "any ... option ... on any security ... or group or index of securities, including any interest therein and based on the value thereof." *Id.* § 301, 114 Stat. at 2763A–450.

*Co.*, 166 F.3d 540, 544 (2d Cir.1999). A contrary reading would mean that the statute illogically both includes and excludes cash-settled options in the same sentence. In other words, there is no basis for reading into the term "option" as used in the phrase "option . . . on any security" a limitation requiring a particular method of settlement—a limitation that clearly does not apply to "option" as used in the phrase "option . . . on any . . . index of securities." The *Procter & Gamble* court's application of the parenthetical also produced the odd consequence that Rule 10b–5 would cover options based on the value of two securities but not options based on the value of single security. We do not agree with this interpretation and, accordingly, we hold that there is no textual basis for reading section 3(a)(10) to define "option" as including only transactions that give the holder the right to receive the underlying securities.

Thus, section 3(a)(10)'s broad definition of "security" to include an option on any "security" as well as an option on any "group or index of securities" permits no distinction between cash-settled options and those that are settled by physical delivery. Accordingly, Caiola's cash-settled over-the-counter options are securities under section 3(a)(10).

### b. Equity Swaps

■ Caiola does not argue that, at the time of his trades, his equity swaps were covered by section 10(b), but urges us to apply retroactively the CFMA's amendments to section 10(b). In December 2000, Congress enacted the CFMA to, among other things, clarify the status of swap agreements under the securities laws. CFMA § 2, 114 Stat. at 2763A–366. Sections 302 and 303 of the CMFA define

"swap agreements" and then expressly exclude them from the definition of "securities," but amend section 10(b) to reach swap agreements. *Id.* §§ 302, 303, 114 Stat. at 2763A–452. Had Caiola entered into his synthetic stock transactions after the enactment of the CFMA, they clearly would now be covered under Rule 10b–5. To prevail on a retroactivity argument, Caiola faces a substantial burden. "Elementary considerations of fairness dictate that individuals should have an opportunity to know what the law is and to conform their conduct accordingly; settled expectations should not be lightly disrupted." *Landgraf v. USI Film Prods.*, 511 U.S. 244, 265, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994); *see Hughes Aircraft Co. v. United States*, 520 U.S. 939, 946, 117 S.Ct. 1871, 138 L.Ed.2d 135 (1997) ("[W]e apply this time-honored presumption [against retroactive legislation] unless Congress has clearly manifested its intent to the contrary.").

■ We find it unnecessary to resolve whether Caiola has overcome this hurdle because he failed to raise the issue properly in the District Court and we generally do not consider arguments not raised below. *First City, Texas–Houston, N.A. v. Rafidain Bank*, 281 F.3d 48, 52–53 (2d Cir.2002); *Pulvers v. First UNUM Life Ins. Co.*, 210 F.3d 89, 95 (2d Cir.2000); *cf. Readco, Inc. v. Marine Midland Bank*, 81 F.3d 295, 302 (2d Cir.1996) (stating that the "general rule" of not considering matters not raised before the district court "may be disregarded in two circumstances: (1) where consideration of the issue is necessary to avoid manifest injustice or (2) where the issue is purely legal and there is no need for additional fact-finding").

---

Thus, options based on the value of a security are not "swap agreements;" they are securities. The District Court's analysis failed to account for this exclusion.

The District Court ordered the parties to brief "the impact of the [CFMA] on whether the transactions at issue in this case constitute 'securities' under federal law.". The order provided Caiola with the opportunity to argue retroactivity, but his response was insufficient to preserve the issue for appellate review. Although, in a footnote, Caiola mentions "settled expectations" and cites cases applying statutes to pre-enactment conduct, he never discusses retroactivity.[8] Consequently, we conclude that the issue was not properly raised below and, because there is no manifest injustice in our declining to hear this argument in the first instance here, we choose not to consider it. *Cf. United States v. Restrepo*, 986 F.2d 1462, 1463 (2d Cir.1993) (refusing to consider argument raised only in an appellate brief footnote because "[w]e do not consider an argument mentioned only in a footnote to be adequately raised or preserved for appellate review").

### B. Material Misrepresentations

 As an alternative ground for dismissal, the District Court concluded that

Caiola failed to allege material misrepresentations, a conclusion Citibank does not defend on appeal. To reach this holding, the District Court focused on the terms of the ISDA Agreement and language from the Confirmation providing that neither party was "relying on any advice, statements or recommendations (whether written or oral) of the other party regarding such Transaction, other than the written representations expressly made by that other party in the [ISDA] Agreement and in this Confirmation in respect of such Transaction." (Confirmation ¶ 9(a)(i).)

The District Court concluded that these terms meant that Citibank was under no obligation to disclose its investment or hedging strategy to Caiola and "[b]ecause the oral misrepresentations allegedly made by Citibank directly conflict with unambiguous language in the Confirmation, the language in the Confirmation controls and the misrepresentations alleged in the complaint can be disregarded." *Caiola*, 137 F.Supp.2d at 372. The District Court's

---

8. The footnote stated as follows:

Moreover, it should come as no surprise to Citibank that its conduct in engaging in securities-based swap agreements would be subject to prohibitions against fraud and manipulations. Not only has the SEC consistently stated that such conduct was actionable under the securities laws, but, particularly in light of the age old existence of a common law fraud remedy, Citibank simply cannot have had some sort of "settled expectation" that it could . commit fraud with impunity so long as securities-based swap agreements were involved. *See generally U.S. v. Certain Funds Contained in Account Numbers 600–306211–006, 600–306211–011 and 600–306211–014 Located at Hong Kong and Shanghai Banking Corp.*, 96 F.3d 20, 23–24 (2d Cir.1996) (applying the Anti–Money Laundering Act of 1992 to pre-enactment conduct since "the claimants never had any right to property resulting from illegal gains, and their alleged drug smuggling and money laundering have al-

ways carried criminal penalties"); *Cabiri v. Assasie–Gyimah*, 921 F.Supp. 1189, 1196 (S.D.N.Y.1996) (applying Torture Victim Protection Act to pre-enactment conduct because even "prior to the promulgation of the Torture Act, the defendant had fair notice that torture was not a lawful act"); *Xuncax v. Gramajo*, 886 F.Supp. 162, 177 (D.Mass.1995) (applying Torture Victim Protection Act to pre-enactment conduct because "It cannot be suggested credibly that [defendant] 'believed' his actions fell within some prevailing legal norm"). At most, Citibank can only claim that pre-CFMA law was unsettled regarding the applicability of Rule 10b–5 to securities-based swap agreements. But, by definition, an unsettled legal environment cannot give rise to a settled expectation on Citibank's part that it could commit fraud.

(Plaintiff's Memorandum in Response to Defendant's Supplemental Memorandum in Support of Motion to Dismiss, at 8 n. 5.)

conclusion that the Confirmation's disclaimers precluded a finding of materiality was incorrect because materiality is an objective standard. The disclaimers are relevant to the analytically distinct element of reliance under Rule 10b–5, discussed below.

 The District Court also rejected Caiola's allegation that Citibank misrepresented the reasoning behind its decision to early exercise certain options and to refuse to engage in additional synthetic transactions, because it believed "Citibank had the contractual right to take these actions and the reasoning behind Citibank's decision to take these actions would not reasonably affect an investor's decisionmaking." *Id.* at 373. The applicable materiality standard under section 10(b) and Rule 10b–5 is set forth in *Basic Inc. v. Levinson*, 485 U.S. 224, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988). "[T]o fulfill the materiality requirement 'there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available.' " *Id.* at 231–32, 108 S.Ct. 978 (quoting *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976)). "At the pleading stage, a plaintiff satisfies the materiality requirement of Rule 10b–5 by alleging a statement or omission that a reasonable investor would have considered significant in making investment decisions." *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 161 (2d Cir.2000).

Caiola's Complaint, we conclude, easily satisfies *Basic*'s test for materiality. Caiola alleges that Citibank falsely told him that their trading relationship would not change subsequent to the Travelers merger, and that had he known that the relationship would change, he would have closed his account. (Compl.¶.165.) In-deed, Caiola alleges that Citibank knew this information was material, since a Citibank representative informed him "that he understood that Citibank's conduct was totally inconsistent with Mr. Caiola's hedging investment strategy and that he understood that if Mr. Caiola had known the truth he would have . . . 'run like a rabbit' from Citibank." (*Id.* ¶ 162.) Moreover, the Complaint alleges:

Citibank thereby exposed Mr. Caiola to precisely the risks that Citibank advised he could and should avoid through the use of synthetic trading, including risks associated with the footprint such large transactions have in the physical market and the risk that such large positions could not be closed or "unwound" by Mr. Caiola on demand without exposing Mr. Caiola to potentially catastrophic risk. (*Id.* ¶ 19.)

Mr. Caiola's continued willingness to enter into such transactions was, start to finish, dependent on his reasonable expectation, based on express representations from Citibank, that he would be able to continue his hedging investment strategy on an ongoing basis with Citibank and would therefore be able to manage the positions he held in order to keep risks at acceptable levels. (*Id.* ¶ 98.)

[Citibank officers] admitted that they knew Citibank's conduct had eliminated Mr. Caiola's ability to use his hedging mechanism and his ability to continue to manage his portfolio." (*Id.* ¶ 135.)

Throughout the Complaint, Caiola alleges that Citibank continued to mislead him as it abandoned delta hedging and bought and sold exchange-traded stock and options on his behalf without disclosing these activities to him. (*Id.* ¶¶ 99–114, 134–36, 150, 176, 182–83). These misrepresentations are clearly sufficient under Rule 10b–5 because they are the sort that "a reason-

able person would consider [ ] important in deciding whether to buy or sell shares." *Azrielli v. Cohen Law Offices*, 21 F.3d 512, 518 (2d Cir.1994).

### C. Reasonable Reliance

■■■ Relying on various provisions of the ISDA Agreement and the Confirmation, Citibank argues that a reasonable investor of Caiola's sophistication would not have relied upon Citibank's oral misrepresentations in light of the disclaimers.[9] In particular, the Confirmation specifically provided that Caiola would not be relying on Citibank's advice or recommendations, that he would make his own investment decisions, and that Citibank would not be his fiduciary or advisor. (Confirmation ¶ 9(a).)

We are not persuaded that these disclaimers barred Caiola from relying on Citibank's oral statements. A disclaimer is generally enforceable only if it "tracks the substance of the alleged misrepresentation. . . ." *Grumman Allied Indus., Inc. v. Rohr Indus., Inc.*, 748 F.2d 729, 735 (2d Cir.1984). The disclaimer provisions contained in the Confirmation fall well short of tracking the particular misrepresentations alleged by Caiola. *See Mfrs. Hanover Trust Co. v. Yanakas*, 7 F.3d 310, 316 (2d Cir.1993) (reciting rule that a valid disclaimer provision "must contain explicit disclaimers of the particular representations that form the basis" of the fraud

claim); *see also Harsco Corp. v. Segui*, 91 F.3d 337, 345–46 (2d Cir.1996) (enforcing a contractual disclaimer containing specific representations). Caiola specifically alleges that Citibank offered false assurances that after the Travelers merger the parties' existing trading relationship would not change and that Citibank would continue to act as a delta hedging counterparty. (*E.g.*, Compl. ¶¶ 85, 98, 101.) The disclaimer in the Confirmation states only in general terms that neither party relies "on any advice, statements or recommendation (whether written or oral) of the other party." (Confirmation ¶ 9(a)(i).) This disclaimer is general, not specific, and says nothing about Citibank's commitment to delta hedging.

Finally, we deem irrelevant Citibank's contention that the disclaimers meant that it owed Caiola no duty to disclose its hedging strategy. Whether Citibank had such a duty in the first instance is irrelevant because Caiola alleges that Citibank chose to disclose its hedging strategy. Caiola alleges that Citibank affirmatively spoke and, in doing so, made material misrepresentations concerning this strategy: "Citibank representatives, as well as others, repeatedly emphasized that ... Citibank, as counterparty, would always 'warehouse risk' and manage and maintain the necessary delta core position so that Mr. Caiola would be assured of being able to open and

---

9. Observing that "Caiola attributes several misrepresentations to Citibank that contradict unambiguous language in the ISDA Agreement and the Confirmation," the District Court concluded that "parol evidence is inadmissible as a matter of law to contradict the terms of an unambiguous agreement," *Caiola*, 137 F.Supp.2d at 372–73, and that "the oral misrepresentations allegedly made by Citibank ... can be disregarded." *Id.* at 373. We find this importation of parol evidence principles into the federal securities laws to be questionable. A number of courts have

held that the parol evidence rule is an inappropriate test for reliance in fraud actions under section 10(b). *E.g., Laird v. Integrated Res. Inc.*, 897 F.2d 826, 830–31 (5th Cir.1990) (holding that the district court erred by applying the parol evidence rule to exclude evidence of potential fraud under Rule 10b–5); *Grainger v. State Sec. Life Ins. Co.*, 547 F.2d 303, 306–07 & n. 11 (5th Cir.1977) (same); *Doelle v. Ireco Chems.*, 391 F.2d 6, 9 (10th Cir.1968) (holding that parol evidence is admissible to prove understanding prior to sale of stock in a section 10(b) cause of action).

close positions on demand...." (Compl.¶ 62(d).)

Assuming Caiola can prove these allegations, the lack of an independent duty is not, under such circumstances, a defense to Rule 10b–5 liability because upon choosing to speak, one must speak truthfully about material issues. *See Rubin v. Schottenstein, Zox & Dunn,* 143 F.3d 263, 267–68 (6th Cir.1998); *Ackerman v. Schwartz,* 947 F.2d 841, 848 (7th Cir.1991); *Robbins v. Moore Med. Corp.,* 788 F.Supp. 179, 184 (S.D.N.Y.1992). Once Citibank chose to discuss its hedging strategy, it had a duty to be both accurate and complete.

## II. State Law Claims

After dismissing Caiola's claims under the federal securities laws, the District Court declined to exercise supplemental jurisdiction over his state law claims. Because we reinstate Caiola's federal claims, we also reinstate his state law claims because they "form part of the same case or controversy." *See* 28 U.S.C. § 1367(a) (2000); *Primetime 24 Joint Venture v. Nat'l Broad. Co.,* 219 F.3d 92, 104 (2d Cir.2000).

## CONCLUSION

We conclude that:

(1) Caiola sufficiently alleges the purchase and sale of securities;

(2) Caiola's cash-settled over-the-counter options are "securities" under section 3(a)(10) of the 1934 Act;

(3) Caiola has failed properly to raise below whether the CFMA should be applied retroactively to bring equity swaps within the coverage of section 10(b) of the 1934 Act; and

(4) Caiola has adequately pleaded material misrepresentations and reasonable reliance.

We therefore hold that Caiola has sufficiently pleaded fraud in connection with the purchase or sale of securities under Rule 10b–5. Accordingly, we reverse the judgment of the District Court and remand for further proceedings consistent with this opinion.