Joseph STECHLER; Gail Stechler; and Stechler & Co., Inc. f/k/a Joseph Stechler & Co., Inc., Plaintiffs,

v.

SIDLEY, AUSTIN BROWN & WOOD, L.L.P.; R.J. Ruble; the Diversified Group Incorporated; James Haber; Alpha Consultants, Inc.; Alpha Consultants, L.L.C., Ivan Ross; Irwin Rosen; Grant Thornton, L.L.P.; Grant Thornton International; Israel Press, Refco Capital Markets, Ltd., and Refco Capital L.L.C., Defendants.

No. 04 Civ. 5923(SAS).

United States District Court,
S.D. New York.

April 5, 2005.

David R. Deary, W. Ralph Canada, Jeven R. Sloan, Stewart Clancy, Deary Montgomery Defeo & Canada, Dallas, TX, Jeffrey H. Daichman, Kane & Kessler, P.C., New York City, for Plaintiffs.

William B. Wachtel, Howard Kleinhendler, Wachtel & Masyr, L.L.P., New York City, for Defendants Diversified Group Incorporated and James Haber.

Aaron R. Marcu, Andrew A. Ruffing, Jason P. Criss, Covington & Burling, New York City, Bruce D. Abbot, Brad D. Brian, Richard E. Drooyan, Munger, Tolles & Olson, L.L.P., Los Angeles, CA, for Defendant Sidley Austin Brown & Wood, L.L.P.

Stuart Abrams, Frankel & Abrams, New York City, for Defendant R.J. Ruble.

Mike Ware, Steven Wolowitz, Mayer, Brown, Rowe & Maw, L.L.P., New York City, for Defendants Refco Capital Markets, Ltd. and Refco Capital, L.L.C.

Cathy Ann Fleming, Edwards & Angell, L.L.P., New York City, Gary Woodfield, Edwards & Angell, L.L.P., West Palm Beach, FL, for Defendants Alpha Consultants, Inc., Alpha Consultants, L.L.C., Ivan Ross and Irwin Rosen.

Bruce Schneider, Tom Hakemi, Stroock, Stroock & Lavan, L.L.P., New York City, for Defendants Grant Thornton, L.L.P., Grant Thornton International and Israel Press.

## *OPINION AND ORDER*

SCHEINDLIN, District Judge.

### I. INTRODUCTION

This case arises out of tax and consulting services offered by several legal and financial services firms. Plaintiffs allege a conspiracy among defendants to market, sell and implement a tax shelter—known as the Digital Options Strategy—which defendants knew or should have known would be considered unlawful by the IRS. Plaintiffs allege that defendants violated the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962, and are liable for damages and other relief arising from unjust enrichment, breach of contract, breach of the duty of good faith and fair dealing, breach of fiduciary duty, fraud, negligent misrepresentation, professional malpractice, and civil conspiracy. Jurisdiction is based on the presence of a federal question, pursuant to 28 U.S.C. § 1331. All defendants other than Refco now move to dismiss the complaint.[1] In

---

1. Defendants are the law firm Sidley Austin Brown & Wood, L.L.P. and its former partner, R.J. Ruble, Esq. (collectively, "Brown & Wood"); The Diversified Group Incorporated and James Haber, its president during the relevant period (collectively, "DGI"); Grant Thornton, L.L.P., Grant Thornton International and Israel Press, an employee (collectively, "Grant Thornton"); Alpha Consultants, L.L.C., Alpha Consultants, Inc., and its princi-

addition, DGI and Brown & Wood move to compel arbitration and stay the proceedings. For the following reasons, the motions to compel arbitration are granted in part and denied in part, and the motions to dismiss are granted with leave to amend.

## II. BACKGROUND

### A. The Alleged Conspiracy

The Stechlers allege a complex conspiracy among a number of defendants, the details of which are largely irrelevant to the disposition of the present motions. Only the general outlines of the conspiracy are described here. These facts are drawn from the allegations in the Amended Complaint, and are presumed to be true for the purpose of the motions to dismiss.

The tax shelter known as the Digital Options Strategy was developed by DGI in the mid–90s.[2] DGI sold the Strategy to wealthy individuals who had realized large capital gains. DGI recruited the other defendants to play a variety of roles in marketing and implementing the Strategy.[3] Grant Thornton agreed to identify potential purchasers of the Strategy among their clients and to assist DGI in marketing and selling the strategy to those individuals. DGI and Grant Thornton would present the Strategy to potential clients, assuring them that "the Strategy would more than likely pass IRS scrutiny if they were ever audited"—a representation that, the Stechlers allege, defendants knew or should have known was false.[4] Grant Thornton also prepared tax returns

reflecting the Strategy. Alpha and Refco agreed to assist DGI in implementing the transactions required to execute the Strategy. In addition, DGI recruited Brown & Wood to provide clients with a purportedly independent opinion letter attesting to the propriety of the tax shelter transaction. DGI and the other defendants entered into an arrangement whereby each defendant would receive a certain portion of the fee paid to DGI for the Strategy.

### B. The Digital Options Strategy

To carry out the Digital Options Strategy, the taxpayer first forms a limited liability company (LLC) and an S corporation.[5] Through the LLC, the taxpayer enters into two offsetting Digital Options Contracts with a counterparty. In the first contract (the "Long Option"), the taxpayer *purchases* a digital option on the Nasdaq 100 Index; in the second (the "Short Option"), the taxpayer *sells* a digital option on the Index. The cost to the taxpayer of the purchased option is largely offset by the payment made for the sold option. These contracts are matters of private contract between the taxpayer and the counterparty, and are not traded on any recognized exchange.

The first contract will result in a payout, of a certain fixed sum[6] to the taxpayer if the Reference Price on the Index is at or above a certain Strike Price during a fifteen minute period on a certain date. The second contract will require the client to pay out a roughly equal sum if the Refer-

---

pals Ivan Ross and Irwin Rosen (collectively, "Alpha"); and Refco Capital Markets, Ltd. and Refco Capital, L.L.C. (collectively, "Refco").

2. *See* Amended Complaint ("Am.Compl.") ¶ 23.

3. *See id.* ¶¶ 42–50.

4. *Id.* ¶ 56.

5. The following description of the Strategy is taken from the Amended Complaint, ¶¶ 19–22, 25–28, 88.

6. Digital Options acquire their name from the distinctive fact that the payout is fixed. They are 'digital' as opposed to 'analog,' in that—unlike a standard option—they either pay out a fixed sum, or nothing at all. *See id.* ¶ 21.

ence Price on the Index is at or above a certain Strike Price—within fractions of a penny of the strike price on the opposing contract—on that date. Because the strike prices are so close, and because the counterparty has the discretion to pick the precise moment during the fifteen minute period when the Reference Price will be determined, the overwhelming likelihood is that either both payments or neither will be made, and the transaction will be close to a wash.

The taxpayer then contributes his or her interest in the LLC to another LLC, a fund managed by DGI and Alpha. In return, the taxpayer receives an interest in the fund. For tax purposes the taxpayer's interest in the fund has a basis equal to the amount the taxpayer paid for the Long Option. However, according to the promoters of the Strategy, the amount received for and the potential obligation to pay out on the Short Option are ignored for basis purposes because the Short Option is viewed as a contingent liability.

The taxpayer then asks to be redeemed from the fund. As payment for the taxpayer's interest in the fund, the taxpayer receives cash and other assets owned by the fund. These assets have (pursuant to the Digital Options Strategy) a basis equal to the taxpayer's artificially inflated basis in his or her interest in the fund. The assets thus acquire an artificially inflated basis, far in excess of their fair market value. The taxpayer then contributes those assets to the taxpayer's S corporation. The S corporation then sells the assets, realizing a large capital loss. This loss is then applied to eliminate or reduce the taxpayer's capital gains, substantially reducing his or her tax liability.

## C. The Stechlers' Involvement in the Strategy

During the latter part of 2000, Mr. Stechler's company had large capital gains from the sale of certain stock holdings.[7] After realizing these gains, the Stechlers met with their long-term accountant, Israel Press of Grant Thornton, to discuss the implications of the capital gains and develop a tax plan.[8] Press scheduled meetings with James Haber of DGI to discuss tax shelters, including the Digital Options Strategy.[9] During the course of these meetings, Press and Haber represented that the Strategy would pass muster with the IRS, and that Brown & Wood would provide an independent evaluation of the strategy.[10]

In November 2000, the Stechlers agreed to engage in the Strategy, and paid DGI $750,000 to implement the Strategy.[11] The Stechlers formed JXS Trading LLC ("JXS Trading") for the purpose of carrying out the Strategy.[12] The Stechlers entered into an operating agreement with DGI (the "JXS Operating Agreement").[13] Under the JXS Operating Agreement, Mr. Stechler became the sole member of JXS Trading, and DGI became its manager. The Agreement establishes their "rights and obligations ... in connection with forming and operating" JXS Trading.[14] The Agreement contains an arbitration clause.[15]

7. *See id.* ¶ 53.

8. *See id.*

9. *See id.*

10. *See id.* ¶ 54.

11. *See id.* ¶ 96.

12. *See id.* ¶ 97.

13. *See* JXS Operating Agreement, Ex. A, Tab 3 to Declaration of Howard Kleinhendler, Esq., in Support of DGI's Motion ("Kleinhendler Decl.").

14. *Id.,* Second Whereas Clause.

15. *See id.* § 12.6.

On November 9, 2000, the Stechlers entered into two Digital Options Contracts with Refco.[16] The Stechlers paid $25,000,000 for a Long Option and received $24,500,000 for the Short Option. The Long Option provided that, if the Reference Price of the Nasdaq 100 Index on January 19, 2001 between 9:30 and 9:45 a.m. exceeded the strike price of $3,716.84, Refco would pay the Stechlers $140,230,051. The Short Option provided that, if the Reference Price at that time exceeded the strike price of $3,716.87, the Stechlers would pay Refco $138,430,056.

DGI and Alpha formed AD Equity Fund 2000 LLC ("the Fund") on November 3, 2000.[17] In the process of forming the Fund, DGI and Alpha signed another operating agreement, the "Fund Operating Agreement."[18] On November 15, 2000, the Stechlers contributed their interest in JXS Trading to the Fund in exchange for an 87.72% interest in the Fund.[19] On joining the Fund, Mr. Stechler also signed the Fund Operating Agreement.[20] The Fund Operating Agreement contained an arbitration provision.[21] On the same day, Mr. Stechler signed a Contribution Agreement with the Fund, memorializing the contribution of the Stechlers' interest in JXS Trading to the Fund.[22] The Contribution Agreement does not contain an arbitration clause. However, the Contribution Agreement is subject to the terms and conditions of the JXS Operating Agreement and the Fund Operating Agreement.[23]

■ The Stechlers resigned from the Fund on December 20, 2000.[24] In redemption of their interest in the Fund, the Stechlers received a distribution with a fair market value of $31,249, consisting of $2,179 in cash and $29,070 in marketable securities.[25] On the same day, the Stechlers contributed the cash and securities to Joseph Stechler & Co., Inc., an S corporation.[26] Joseph Stechler & Co. subsequently sold those assets for their fair market value.[27]

In February 2001, the Stechlers received the promised opinion letter from Brown & Wood, attesting to the validity of the Digital Options Strategy.[28] In July 2001, they filed their tax return for 2000, including the artificial losses generated by

16. See Am. Compl. ¶¶ 98–103.

17. See id. ¶ 106.

18. See Fund Operating Agreement, Ex. A, Tab 5 to Kleinhendler Decl.

19. See Am. Compl. ¶ 106.

20. See Fund Operating Agreement.

21. See id. § 13.6.

22. See Contribution Agreement, Ex. A, Tab 6 to Kleinhendler Decl.

23. See id., Third Whereas Clause.

24. See Am. Compl. ¶ 108.

25. See id. Although the Complaint carefully refers to these securities as "assets," the Stechlers concede that these assets were in fact marketable securities. See the Stechlers'

Consolidated Response to Defendants' Motion to Dismiss RICO Claims ("RICO Response") at 5. These securities included the common stock of Qualcomm, Inc., Stillwell Financial, Inc., NVIDIA Corp., EntreMed, Inc., Check Point Software Tech. Inc., RF Micro Devices, Inc., and Corning Inc. See Summary of Transaction from AD Equity Fund 2000 LLC Closing Binder, Ex. A, Tab 1 to Kleinhendler Decl. in Support of DGI's Motion to Dismiss. On a motion to dismiss, a court may consider documents incorporated by reference into or relied on in the Complaint. See International Audiotext Network, Inc. v. Am. Tel. & Tel. Co., 62 F.3d 69, 72 (2d Cir.1995). The Stechlers both refer to and rely on the Closing Binder. See Am. Compl. ¶ 178.

26. See Am. Compl. ¶ 109.

27. See id. ¶ 110.

28. See id. ¶ 120.

the Digital Options Strategy.[29] Grant Thornton prepared the Stechlers' 2000 tax return.[30]

In December 2000, before the Stechlers engaged in the Digital Option Strategy, the IRS began an investigation into the Strategy and similar shelters, serving DGI with a request for a list of clients who had engaged in such shelters.[31] This was not disclosed to the Stechlers.[32] In 2001, the IRS offered an amnesty program for individuals who had participated in the Strategy and similar shelters.[33] In March 2002, Brown & Wood informed the Stechlers of the amnesty program, and advised them to contact their accountants to determine whether they should participate in the program.[34] The Stechlers contacted Grant Thornton, who advised them not to participate.[35]

On January 23, 2003, DGI informed the Stechlers by letter of the IRS' investigation of the Digital Options Strategy, and advised them to obtain counsel experienced in tax matters.[36] On June 19, 2003, the IRS notified the Stechlers that their 2000 tax return had been selected for examination.[37] The Stechlers retained new counsel.[38] The Stechlers have settled with the IRS, agreeing to pay back taxes, interest and a 10% penalty, and losing 50% of their deductions for fees and other out of pocket costs.[39] The Stechlers brought this suit on July 29, 2004.

## III. LEGAL STANDARD

### A. Arbitrability

▮ The determination of whether a dispute is arbitrable under the FAA comprises two questions: "(1) whether there exists a valid agreement to arbitrate at all under the contract in question ... and if so, (2) whether the particular dispute sought to be arbitrated falls within the scope of the arbitration agreement."[40] To find a valid agreement to arbitrate, a court must apply the "generally accepted principles of contract law."[41] "[A] party is bound by the provisions of a contract that he signs, unless he can show special circumstances that would relieve him of such obligation."[42] A court should consider only "whether there was an objective agreement with respect to the entire contract."[43]

▮ Because there is "a strong federal policy favoring arbitration ... where [ ] the existence of an arbitration agreement is undisputed, doubts as to whether a claim falls within the scope of that agreement should be resolved in favor of arbitrability."[44] Thus, the Second Circuit has em-

29. *See id.* ¶ 127.

30. *See id.* ¶ 124.

31. *See id.* ¶ 60.

32. *See id.*

33. *See id.* ¶ 132.

34. *See id.* ¶ 133.

35. *See id.*

36. *See id.* ¶¶ 79–80.

37. *See id.* ¶ 82.

38. *See id.* ¶ 135.

39. *See id.* ¶ 150.

40. *Hartford Acc. and Indem. Co. v. Swiss Reinsurance Amer. Corp.*, 246 F.3d 219, 226 (2d Cir.2001) (quotation omitted).

41. *Genesco, Inc. v. T. Kakiuchi & Co.*, 815 F.2d 840, 845 (2d Cir.1987).

42. *Id.*

43. *Id.*

44. *ACE Capital Re Overseas Ltd. v. Central United Life Ins. Co.*, 307 F.3d 24, 28 (2d

phasized that

> any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration. Accordingly, [f]ederal policy requires us to construe arbitration clauses as broadly as possible. We will compel arbitration unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute.[45]

However, although federal policy favors arbitration, it is a matter of consent under the FAA, and "a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." [46]

█ The Second Circuit has established a three-part inquiry for determining whether a particular dispute falls within the scope of the arbitration agreement.[47] *First,* "a court should classify the particular clause as either broad or narrow." [48] *Second,* if the clause is narrow, "the court must determine whether the dispute is over an issue that 'is on its face within the purview of the clause,' or over a collateral issue that is somehow connected to the main agreement that contains the arbitration clause." [49] "Where the arbitration clause is narrow, a collateral matter will generally be ruled beyond its purview." [50] *Third,* if the arbitration clause is broad, " 'there arises a presumption of arbitrability' and arbitration of even a collateral matter will be ordered if the claim alleged 'implicates issues of contract construction or the parties' rights and obligations under it' " [51] or "[i]f the allegations underlying the claims 'touch matters' covered by the parties' agreements." [52] In making this determination, courts must "focus on the factual allegations in the complaint rather than the legal causes of action asserted." [53]

## B. The Standard of Review for a Motion to Dismiss

A motion to dismiss should be granted only if "it appears beyond doubt that the plaintiff can prove no set of facts in support of [its] claim which would entitle [it] to relief." [54] At the motion to dismiss stage, the issue "is not whether a plaintiff is likely to prevail ultimately, but whether the claimant is entitled to offer evidence to support the claims. Indeed, it may appear on the face of the pleading that a recovery is very remote and unlikely, but that is not the test." [55]

---

Cir.2002) (quotation marks and citations omitted).

**45.** *Collins & Aikman Prods. Co. v. Building Sys., Inc.,* 58 F.3d 16, 19 (2d Cir.1995). *Accord WorldCrisa Corp. v. Armstrong,* 129 F.3d 71, 74 (2d Cir.1997).

**46.** *Louis Dreyfus Negoce S.A. v. Blystad Shipping & Trading Inc.,* 252 F.3d 218, 224 (2d Cir.2001) (quotation omitted).

**47.** *See id.*

**48.** *Id.*

**49.** *Id.* (quoting *Rochdale Vill., Inc. v. Public Service Employees Union,* 605 F.2d 1290, 1295 (2d Cir.1979)).

**50.** *Id.*

**51.** *Id.* (quoting *Collins & Aikman,* 58 F.3d at 23).

**52.** *Paramedics Electromedicina Comercial, Ltda. v. GE Med. Sys. Info. Techs, Inc.,* 369 F.3d 645, 654 (2d Cir.2004) (quoting *Smith/Enron Cogeneration Ltd. P'ship v. Smith Cogeneration Int'l,* 198 F.3d 88, 99 (2d Cir.1999)).

**53.** *JLM Indus. v. Stolt–Nielsen SA,* 387 F.3d 163, 174 (2d Cir.2004).

**54.** *Weixel v. Board of Educ. of New York,* 287 F.3d 138, 145 (2d Cir.2002) (quoting *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957) (alterations omitted)).

**55.** *Phelps v. Kapnolas,* 308 F.3d 180, 184–85 (2d Cir.2002) (quotation omitted).

A complaint need not state the legal theory, facts, or elements underlying the claim except in certain instances. Pursuant to the simplified pleading standard of Rule 8(a) of the Federal Rules of Civil Procedure, "a complaint must include only 'a short and plain statement of the claim showing that the pleader is entitled to relief.' " [56] In contrast, the heightened pleading standard of Rule 9(b) requires that in claims of fraud or mistake "the circumstances constituting fraud or mistake shall be stated with particularity." [57]

The task of the court in ruling on a motion to dismiss is "merely to assess the legal feasibility of the complaint, not to assay the weight of evidence which might be offered in support thereof." [58] When deciding a motion to dismiss, courts must accept all factual allegations in the complaint as true and draw all reasonable inferences in plaintiff's favor.[59]

## IV. DISCUSSION

### A. The Arbitrability of the Dispute

#### 1. DGI's Motion to Compel Arbitration

DGI moves to compel arbitration on the basis of the arbitration clauses in the JXS Operating Agreement and the Fund Operating Agreement. In addition, DGI relies on the Contribution Agreement, which DGI contends incorporates the arbitration clauses of the Operating Agreements by reference.

The JXS Operating Agreement, executed by DGI and Mr. Stechler, "establish[es] their respective rights and obligations . . . in connection with forming and operating" JXS Trading.[60] The Agreement appoints DGI as the manager of the company. The Agreement sets out the purpose of JXS Trading as being "to acquire, own, invest in, sell, assign, transfer and trade United States and foreign currencies and futures contracts relating to currencies and other commodities the subject of cash settled put and/or call options including interest rates, market value indices, equity and fixed income securities and similar investments." [61] An arbitration clause provides that "any dispute, controversy or claim arising out of or relating to this Agreement shall be settled promptly by arbitration . . . ." [62]

Similarly, the Fund Operating Agreement, executed by Mr. Stechler, DGI and Alpha, "establish[es] their respective rights and obligations . . . in connection with forming and operating" the Fund.[63] The Agreement appoints DGI and Alpha as managers of the Fund. The Fund Operating Agreement contains an identical statement of corporate purposes to that contained in the JXS Operating Agreement, and an identical arbitration clause.[64]

 The Contribution Agreement, executed by Mr. Stechler and by DGI as manager of the Fund, provides that Mr. Stechler contribute his interest in JXS Trading to the Fund, in return for an

**56.** *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 512, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002) (quoting Rule 8(a)(2)).

**57.** Fed.R.Civ.P. 9(b).

**58.** *Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y.*, 375 F.3d 168, 176 (2d Cir.2004) (quotation omitted).

**59.** *See Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir.2002).

**60.** JXS Operating Agreement, Second Whereas Clause.

**61.** *Id.* § 2.4.

**62.** *Id.* § 12.6.

**63.** Fund Operating Agreement, Second Whereas Clause.

**64.** *See id.* §§ 2.4, 13.6.

87.72% membership interest in the Fund. The Contribution Agreement does not contain an arbitration clause; however, it does provide that the transaction is governed by the "terms and conditions set forth in this Agreement and that certain Operating Agreement of the Company dated November 3, 2000[ ] among The Diversified Group Incorporated [ ] and Alpha Consultants LLC." [65] The Contribution Agreement thus clearly incorporates by reference the arbitration provisions of the JXS Operating Agreement.[66]

These three Agreements establish the rights and obligations of the Stechlers and DGI with respect to the formation and operation of the limited liability companies created to carry out the Strategy. The Stechlers bring no claims concerning performance of these Agreements, and neither JXS Trading nor the Fund are parties to this suit. The Stechlers' claims are based on defendants' provision of allegedly fraudulent or negligent tax advice. None of the Agreements relates directly to the provision of tax advice.[67] As in the related tax shelter case of *Denney v. Jenkens & Gilchrist*, it appears that the provision of tax advice "was done pursuant to oral agreements, which of course contain no arbitration clauses." [68] The Stechlers' claims are therefore merely collateral to the Agreements.[69]

The arbitration clauses are clearly broad.[70] The Second Circuit has recently emphasized that a broad arbitration clause may extend to a collateral issue even where the collateral issue involves no "issue of contract interpretation [or] construction, or application of any provision of the charter," if the collateral issue 'touches matters' covered by the parties' contracts.[71] In *JLM Industries*, as in the instant case, the court dealt with "a broad arbitration clause and the question of its applicability to a dispute resting on factual allegations which concern matters beyond the making of a particular contract between the parties and the performance of its terms." [72]

65. Contribution Agreement, Third Whereas Clause.

66. "Under general principles of contract law, a contract may incorporate another document by making clear reference to it and describing it in such terms that its identity may be ascertained beyond doubt." *New Moon Shipping Co., Ltd. v. MAN B & W Diesel AG*, 121 F.3d 24, 30 (2d Cir.1997).

67. By contrast, in *Camferdam v. Ernst & Young Int'l, Inc.*, No. 02 Civ. 10100, 2004 WL 307292 (S.D.N.Y. Feb. 13, 2004), a tax shelter case related to the instant case and relied on by DGI, the court compelled arbitration on the basis of an arbitration clause that expressly applied to "[a]ny controversy or claim arising out of or relating to tax and tax-related services now or hereafter provided by us to you." *Id.* at *2.

68. 340 F.Supp.2d 348, 353 (S.D.N.Y.2004).

69. In *Denney*, the written agreements containing arbitration clauses were in contracts for services wholly unrelated to the tax shelter services at issue. As a result, the *Denney* plaintiffs' claims did "not constitute even a collateral matter." *Id.* at 352.

70. *See Collins & Aikman*, 58 F.3d at 20 ("The clause in this case, submitting to arbitration 'any claim or controversy arising out of or relating to the agreement,' is the paradigm of a broad clause.").

71. *JLM Indus.*, 387 F.3d at 173. The court acknowledged the vagueness of this concept, admitting that "we have doubted the utility of phrases such as 'touch matters' in determining whether a broad arbitration clause is applicable to a dispute which departs from the casebook model of a contract dispute because the applicability of such an arbitration clause cannot be resolved simply through the interpretation and enforcement of contract language." *Id.*

72. *Id.* at 175.

The plaintiffs in *JLM Industries* alleged that the defendants had engaged in a conspiracy to fix freight rates for ocean transportation of liquid chemicals. The individual shipping transactions at issue were each governed by a standard form contract, which "set[ ] forth the terms of a particular shipment, such as the nature of the freight being shipped, expected departure and arrival dates, and freight rates." [73] The standard form contract contained a broad arbitration clause. Although plaintiffs' conspiracy claims did not implicate "interpretation, construction, or application of any provision" of the contracts, the court held that they were nonetheless arbitrable. [74] The court found that plaintiffs' price-fixing claims "unquestionably involve a core issue of the contracts between the parties—allegations that the price terms set forth in those contracts have been artificially inflated as a result of the price-fixing conspiracy." [75] In addition, the court observed that plaintiffs' claimed injuries arose from the fact of their entry into contracts containing the allegedly inflated price terms. [76]

Similarly, the Stechlers' claims 'touch' the subject matter of the Agreements. Their claims arise out of the creation of JXS Trading and their entry into the Fund: had these entities not been formed, the Strategy could not have been carried out and the Stechlers would have suffered no injury. Conversely, had the Stechlers not decided to carry out the Strategy, they would not have entered into the Agreements: the LLCs were created solely for the purpose of executing the Strategy. [77] The allegations in the Stechlers' complaint repeatedly extend beyond the defendants' representations regarding the Strategy's lawfulness, to refer to defendants' efforts in creating and operating the LLCs. [78]

Ultimately, the question is one of the parties' intent: whether, in entering into the arbitration clauses in the Agreements, the Stechlers intended to refer all disputes relating to the Strategy to arbitration, or only those disputes arising narrowly from a breach of the Agreements. As noted earlier, the LLCs had no purpose and no independent existence outside the context of the Strategy. The natural interpretation of the broad language in the arbitration clauses is that they apply to disputes relating to the Strategy as a whole; any other interpretation would rob them of any practical meaning. Certainly, the Court cannot say "with positive assurance that the arbitration clause is not susceptible of

73. *Id.* at 167.

74. *Id.* at 176.

75. *Id.*

76. *See id.* ("JLM will try to proffer evidence of a conspiracy which was formed independently of the specific contractual relations between the parties. Nevertheless, JLM asserts that it suffered damages as a result of this conspiracy, and it could not have suffered these damages if it had not entered into the 'nearly 80' contracts with the Owners which it alleges were formed during the proposed class period.").

77. The same, of course, is true of the Contribution Agreement.

78. *See, e.g.,* Am. Compl. ¶ 136(21) (accusing defendants of "advising, instructing and/or assisting Plaintiffs in *implementing and carrying out* all phases of the Strategy."). In addition, although the language of the Complaint is somewhat vague, it appears that the Stechlers seek to recover damages not only for the fees they paid defendants for their for tax advice, but also for fees paid for their services in creating the LLCs. *See, e.g.,* Am. Compl. ¶ 238 ("Plaintiffs paid substantial fees to Defendants for tax and investment advice, *paid additional amounts to execute the Strategy,* they unnecessarily purchased the Digital Options Contracts to effectuate the Digital Options Strategy . . .") (emphasis added).

an interpretation" which covers the Strategy as a whole.

■ For the foregoing reasons, DGI's motion to compel arbitration is granted. In addition, although James Haber did not sign the Agreements in his personal capacity, he may take advantage of the arbitration clauses because he was a disclosed agent of DGI.[79] Finally, plaintiffs Gail Stechler and Stechler & Co., Inc. are bound by the arbitration agreements, even though they did not sign them, because they received a "direct benefit" from the Agreements—*i.e.*, the anticipated tax benefits of participation in the Strategy.[80]

### 2. The Arbitrability of the Dispute with Alpha

Alpha's motion and supporting briefs do not address arbitrability. However, Alpha indicates that it "join[s] in the motions and arguments of co-defendants to the extent applicable."[81] Although it is not clear that Alpha seeks to compel arbitration, I note that Alpha, as a signatory to the Fund Operating Agreement and the Contribution Agreement, is entitled to do so.

### 3. Brown & Wood's Motion to Compel Arbitration

■ Brown & Wood has no arbitration agreement with the Stechlers, but seeks to compel arbitration on the basis of DGI's and Alpha's arbitration agreements. "Because arbitration is a matter of contract, exceptional circumstances must apply before a court will impose a contractual agreement to arbitrate on a non-contracting party."[82] However, courts "have recognized that under principles of estoppel, a non-signatory to an arbitration agreement may compel a signatory to that agreement to arbitrate a dispute where a careful review of 'the relationship among the parties, the contracts they signed ..., and the issues that had arisen' among them discloses that 'the issues the nonsignatory is seeking to resolve in arbitration are intertwined with the agreement that the estopped party has signed.'"[83] The Second Circuit has stressed, however, that it is not the case that "a claim against a co-conspirator of [the party entitled to compel arbitration] will *always* be intertwined to a degree sufficient to work an estoppel. The inquiry remains a fact-specific one."[84]

The factors which have led courts to apply estoppel are not present here. Although the Stechlers allege a conspiracy among Brown & Wood and DGI, the Stechlers have not treated Brown & Wood, DGI and Alpha " 'as though they were interchangeable' and as 'a single unit.' "[85] Rather, Brown & Wood, DGI and Alpha played different and distinct roles in the alleged conspiracy. The Stechlers' claims against Brown & Wood are not 'intertwined' with the Agreements 'to a degree

---

79. See Marcus v. Frome, 275 F.Supp.2d 496, 505 (S.D.N.Y.2003) ("were claims against employees or disclosed agents not also subject to arbitration, 'it would be too easy to circumvent the agreements by naming individuals as defendants instead of the entity Agents themselves.' ") (quoting Roby v. Corporation of Lloyd's, 996 F.2d 1353, 1360 (2d Cir.1993)).

80. American Bureau of Shipping v. Tencara Shipyard S.P.A., 170 F.3d 349, 353 (2d Cir. 1999).

81. Alpha's Memorandum of Law in Support of Motion to Dismiss at 25.

82. Miron v. BDO Seidman, L.L.P., 342 F.Supp.2d 324 (E.D.Pa.2004) (citing Thomson–CSF, S.A. v. American Arbitration Ass'n, 64 F.3d 773, 779 (2d Cir.1995)).

83. JLM Indus., 387 F.3d at 177 (quoting Choctaw Generation Ltd. P'ship v. American Home Assurance Co., 271 F.3d 403, 406 (2d Cir.2001)).

84. Id. (emphasis added)

85. Id. (quoting Smith/Enron, 198 F.3d at 97–98).

sufficient to work an estoppel.'[86] Their claims "can hardly be characterized as arising out of or being integrally related to" the Agreements;[87] nor do they " 'make[ ] reference to or presume[ ] the existence of' " the Agreements.[88] "Were this Court to find the Agreement[s] void, invalid, or unenforceable, Plaintiffs would still have valid causes of action against the [Brown & Wood] Defendants."[89]

 Most importantly, there is no indication in the record of any willingness on the Stechlers' part to arbitrate their disputes with Brown & Wood. There is no sign that the Stechlers could have imagined that, in entering into an arbitration agreement with DGI and Alpha, they were also entering into an arbitration agreement with Brown & Wood. Indeed, it is the Stechlers' claim, unrefuted by Brown & Wood, that they understood Brown & Wood to be acting independently of the other defendants, as an independent, outside legal advisor. Brown & Wood's mo-

tion to compel arbitration is therefore denied.

### 3. Brown & Wood's Motion to Stay

 In the alternative, Brown & Wood moves to stay these proceedings pending the outcome of the Stechlers' arbitration with DGI. The Court has the power to grant such a stay "pursuant to the power inherent in every court 'to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants.' "[90] Brown & Wood bears the burden of demonstrating that a stay is justified.[91]

 Brown & Wood is unable to meet this burden: a stay of these proceedings would serve little purpose. Although the Stechlers' claims against DGI and Brown & Wood are clearly related, they are not identical. The Stechlers have claims against Brown & Wood which are independent of their claims against DGI, and are unlikely to be resolved by the arbitration. Brown & Wood complains of " 'the expense and inconvenience of parallel litigation as well as the possibility of inconsistent deter-

**86.** In *JLM Industries*, the court found a sufficient "quantum of 'intertwined-ness' " on the ground, *inter alia*, that JLM's claims were "undeniably intertwined with the charters, since as we have already noted it is the fact of JLM's entry into the charters containing allegedly inflated price terms that gives rise to the claimed injury." *JLM Indus.*, 387 F.3d at 178. Here, no term in the Agreements *directly* gives rise to the Stechlers' injuries. The Stechlers' injuries arise indirectly from the purposes for which the Agreements were entered into, rather than from the terms of the Agreements themselves. The 'quantum of intertwined-ness' here is significantly smaller than in *JLM Industries*. The other factors relied on in that case—including, notably, that JLM's complaint treated the non-signatory as if it was a signatory to the contract, *see id.*—are not present here. Likewise, in *Camferdam*, the court permitted non-signatory defendants to compel arbitration on the basis of arbitration clauses in agreements that expressly covered the provision of tax advice,

whereas, here, Brown & Wood seeks to compel arbitration on the basis of agreements that are only collaterally related to plaintiffs' claims. *See Camferdam*, 2004 WL 307292 at *7. The 'quantum of intertwined-ness' was therefore greater in *Camferdam* than here.

**87.** *Thomson–CSF, S.A.*, 64 F.3d at 779.

**88.** *JLM Indus.*, 387 F.3d at 179 (quoting *MS Dealer Serv. Corp. v. Franklin*, 177 F.3d 942, 947 (11th Cir.1999)).

**89.** *Miron*, 342 F.Supp.2d at 335 (denying motion to compel arbitration on estoppel basis in tax shelter case, where claims against non-signatory were independent of claims against signatory and not based on contract containing arbitration clause).

**90.** *WorldCrisa Corp.*, 129 F.3d at 76 (quoting *Landis v. North American Co.*, 299 U.S. 248, 254, 57 S.Ct. 163, 81 L.Ed. 153 (1936)).

**91.** *See id.*

minations.' " [92] However, many of the key facts underlying the instant dispute are at issue in court proceedings around the country. This Court alone is currently proceeding with *Seippel v. Sidley, Austin Brown & Wood,*[93] in which Brown & Wood is a party, and *Denney* and *Blythe v. Deutsche Bank,*[94] in which none of the instant defendants are parties, but which involve related facts. Brown & Wood, and the courts, will be subject to the expense and inconvenience of parallel litigation regardless of whether these proceedings are stayed. The weak efficiency interest in staying these proceedings is not sufficient to justify delaying the Stechlers' claims.

### B. The Motions to Dismiss the Stechlers' RICO Claims

The Stechlers assert RICO claims against all defendants. RICO provides for civil and criminal liability for entities engaged in "a pattern of racketeering activity." [95] A person who suffers injury as a result of a RICO violation may sue an entity pursuant to 18 U.S.C. § 1964. To demonstrate a "pattern" of racketeering activity, a plaintiff must show at least two predicate acts of racketeering activity occurring within a ten-year period.[96]

Defendants contend that section 107 of the Private Securities Litigation Reform Act ("PSLRA") of 1995,[97] bars the Seippels' RICO claim because the alleged predicate acts describe conduct that is actionable as securities fraud. The PSLRA amended RICO to provide that "no person may rely upon conduct that would have been actionable as fraud in the purchase or sale of securities to establish a violation of section 1962." [98] "In amending RICO, Congress was clear in stating that the PSLRA 'was meant to eliminate the possibility that litigants might frame their securities claims under a mail or wire fraud claim.' " [99]

Consequently, a plaintiff cannot avoid the RICO Amendment's bar by pleading mail fraud, wire fraud and bank fraud as predicate offenses in a civil RICO action if the conduct giving rise to those predicate offenses amounts to securities fraud. Allowing such surgical presentation of the cause of action [ ] would undermine the congressional intent behind the RICO Amendment.[100]

■ Section 10(b) of the Securities Exchange Act makes it "unlawful for any person . . . to use or employ, in connection with the purchase or sale of any security

---

**92.** Brown & Wood's Memorandum of Law at 10 (quoting *Provident Bank v. Kabas,* 141 F.Supp.2d 310, 319 (E.D.N.Y.2001)).

**93.** 03 Civ. 6942.

**94.** 04 Civ. 5867.

**95.** 18 U.S.C. § 1961(a)-(d).

**96.** 18 U.S.C. § 1961(5).

**97.** Pub.L. No. 104–67, § 107.

**98.** 18 U.S.C. § 1964(c).

**99.** *Jordan (Berm.) Inv. Co. v. Hunter Green Investments Ltd.,* 205 F.Supp.2d 243, 248 (S.D.N.Y.2002) (quoting *Mezzonen v. Wright,* No. 99 Civ. 9380, 1999 WL 1037866, at *4 (S.D.N.Y. Nov. 16, 1999)). *See also* Joint Explanatory Statement of the Committee of Conference, in H.R. Conf. Rep. No. 104–369, reprinted in 1995 U.S.C.C.A.N. 730, 746 ("The Conference Committee intends that a plaintiff may not plead other specified offenses, such as mail or wire fraud, as predicate acts under civil RICO if such offenses are based on conduct that would have been actionable as securities fraud.").

**100.** *Bald Eagle Area Sch. Dist. v. Keystone Financial, Inc.,* 189 F.3d 321, 328 (3d Cir. 1999). *Accord Gatz v. Ponsoldt,* 297 F.Supp.2d 719, 730 (D.Del.2003) ("[P]laintiff cannot circumvent the PSLRA's exclusion of securities fraud as a RICO predicate act through artful pleading."); *Burton v. Ken-Crest Servs., Inc.,* 127 F.Supp.2d 673, 677 (E.D.Pa.2001) ("Plaintiff cannot magically revive his claim by picking out discrete details of his allegations and then claiming that they are not actionable as securities fraud.").

... any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe."[101] The Supreme Court has recently explained that the phrase 'in connection with' in section 10(b) should be "construed 'not technically and restrictively, but flexibly to effectuate [the statute's] remedial purposes.'"[102] While it is true that "[i]n general, the 'in connection with' element is met when the fraud alleged is that the plaintiff bought or sold a security in reliance on misrepresentations as to its value,"[103] it is not a requirement. In *SEC v. Zandford,* the Supreme Court observed that "neither the SEC nor this Court has ever held that there must be a misrepresentation about the value of a particular security in order to run afoul of the Act."[104] Instead, *Zandford* held that it is "enough that the scheme to defraud and the sale of securities coincide."[105] However, the Second Circuit has recently cautioned that, even under *Zandford's* expansive reading of the Act, "[t]he fraud must be integral to the purchase and sale of the securities in question."[106]

Here, the predicate acts alleged are mail and wire fraud. The Stechlers allege that the defendants, using telephone, electronic and mail communications, "intentionally and knowingly made [ ] material misrepresentations and knowingly suppressed material facts from Plaintiffs, for the purpose of deceiving them and thereby obtaining financial gain," by causing the Stechlers to "rel[y] on the misrepresentations and omissions in carrying out the transactions and subsequently filing tax returns using the treatment opined."[107] Defendants contend that these alleged predicate acts would be actionable as securities fraud, for two reasons.

### 1. Whether the Digital Options Contracts Are Securities

*First,* defendants argue that "the Digital Options Contracts *themselves* constituted purchases and sales of securities."[108] Therefore, defendants argue that the Stechlers' allegations are actionable as securities fraud, because the Complaint alleges a fraudulent scheme to induce the Stechlers to engage in the purchase and sale of the digital options.

The definition of 'security' under the anti-fraud provisions of the federal securities laws includes options on securities. Section 3(a)(10) of the 1934 Act defines 'security' to include "any put, call, straddle, option, or privilege on any security, certificate of deposit, or group or index of securities (including any interest therein or based on the value thereof)...."[109] In *Caiola v. Citibank, N.A.,* the Second Circuit considered whether the statutory definition covered not only an "option that

---

**101.** 15 U.S.C. § 78j.

**102.** *SEC v. Zandford,* 535 U.S. 813, 819, 122 S.Ct. 1899, 153 L.Ed.2d 1 (2002) (quoting *Affiliated Ute Citizens v. United States,* 406 U.S. 128, 151, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972)).

**103.** *Araujo v. John Hancock Life Ins. Co.,* 206 F.Supp.2d 377, 383 (E.D.N.Y.2002) (quotation omitted).

**104.** *Zandford,* 535 U.S. at 820, 122 S.Ct. 1899. *Accord A.T. Brod & Co. v. Perlow,* 375 F.2d 393 (2d Cir.1967) ("it is established that a 10b–5 action will survive even though the

fraudulent scheme or device is unrelated to 'investment value'").

**105.** *Zandford,* 535 U.S. at 820, 122 S.Ct. 1899.

**106.** *Dabit v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 395 F.3d 25, 31 (2d Cir.2005).

**107.** Am. Compl. ¶ 177.

**108.** Brown & Wood's Memorandum of Law at 11.

**109.** 15 U.S.C. § 78c (a)(10) (2000).

involves the right to take possession of a security ... but [also] a synthetic option that merely obligates the counterparty to make cash payments based on the value of a security." [110]

*Caiola* held that "the right to take possession does not define an 'option' under section 3(a)(10)." [111] The court further held that the particular instruments at issue in *Caiola*—known as "synthetic options"—fell within the statutory definition. In reaching this determination, the court considered the 'economic reality' of synthetic options:

> The Supreme Court has cautioned that in searching for the meaning and scope of the word 'security' ... the emphasis should be on economic reality. The definition of security is construed in a flexible manner, so as to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits. In this way, the economic reality approach permits the SEC and the courts sufficient flexibility to ensure that those who market investments are not able to escape the coverage of the Securities Acts by creating new instruments that would not be covered by a more determinate definition.[112]

The synthetic options at issue in *Caiola* were "a contractual agreement between two counterparties ... that seeks to economically replicate the ownership and physical trading of shares and options. The counterparties establish synthetic positions in shares or options, the values of which are pegged to the market prices of the related physical shares or options." [113] When the synthetic option is exercised, the transaction is settled not in stock, but in the dollar equivalent of stock based on the "then-current market price of the underlying security." [114] Synthetic options permit an investor to acquire the economic equivalent of a large position in a security, while "alleviat[ing] the necessity of posting large amounts of margin capital and ensur[ing] that positions can be established and unwound quickly. Synthetic trading also offers a solution to the 'footprint' problem by permitting the purchase of large volumes of options in stocks without affecting their price." [115]

*Caiola* establishes that instruments like the Digital Options *may* fall within the statutory definition, despite the fact that they do not involve the right to take possession of a security. To determine whether the Digital Options, like synthetic options, constitute securities, the Court must analyze the economic reality of the transactions. Under the economic reality test, it is clear that *Caiola's* synthetic options, designed to be the precise economic equivalent of a standard option, constitute securities. Digital Options, by contrast, are not designed to replicate a standard option transaction. The Second Circuit has described the economic characteristics of a standard option:

> An option, the type of derivative at issue here, is a purchased right to buy or sell property at a fixed or floating price. If not exercised within the contractually-specified period, an option expires and the buyer of the option loses the acquisition price. A call option gives the option holder the right to buy shares of an underlying security at a particular price; thus, '[a] call equivalent position is a derivative security position that *increases in value as the value of the underly-*

---

**110.** 295 F.3d 312, 325 (2d Cir.2002).

**111.** *Id.* at 326.

**112.** *Id.* at 325 (quotations omitted).

**113.** *Id.* at 326.

**114.** *Id.*

**115.** *Id.*

*ing equity increases.'* A put option is the right to sell a security at a specified price; thus, the value of a put option *increases as the price of the underlying security falls.*[116]

By contrast, the defining feature of a Digital Option is that the payoff is fixed: if the Reference Price exceeds the Strike Price, it pays out a certain fixed sum, regardless of whether the Reference Price exceeds the strike price by a penny or by thousands of dollars. Where the payoff of a standard option increases or decreases continuously alongside the value of the underlying security (or index of securities), the payoff of a Digital Option is not tied in any regular, proportional manner to the value of the underlying security (or index).[117] The Stechlers therefore characterize a Digital Option as a bet on where the price of the index will be at a particular time, rather than an option on the value of the index.

Insofar as the 'economic reality' of a Digital Option is determined by the value of its payoff, the Stechlers are likely correct: the Digital Options are merely wagers, not options. DGI, however, responds that "throughout the 71–day duration of the digital options, their value on the secondary market fluctuated based on the value of the Index."[118] DGI offers no further explanation of this argument, instead merely pointing to certain documents from the Closing Binder for the Stechlers' Digital Options transactions. These documents are summaries of the net asset values of JXS Trading and the Fund on a number of days during the 71–day duration of the Digital Options.[119] The summaries suggest that the Digital Options' "theoretical value" on the secondary market moved from day to day, as fluctuations in the index price affected the "current probability" of the Digital Options paying off.[120]

■ Presumably, DGI's argument is that the resale value of a Digital Option moves in relation to the movements of the underlying index in a manner sufficiently similar to that of a standard option to make these instruments their equivalent, and that *Caiola* therefore requires that they be considered securities. This argument has some plausibility: the definition of 'security' is to be construed in a flexible manner, and may encompass novel instruments that are economically similar to, although distinct from, more traditional options. However, it is not clear from these documents (even if the Court were able, on a motion to dismiss, to credit the

---

116. *Magma Power Co. v. Dow Chem. Co.,* 136 F.3d 316, 321 (2d Cir.1998) (quoting 3C Harold S. Bloomenthal and Samuel Wolff, Securities and Federal Corporate Law § 10.11 at 10.73 (1997)) (emphasis added).

117. The erratic and arbitrary relationship between the payoff and the value of the underlying index is even clearer if one considers the Long and Short Digital Options as a single transaction. If the Reference Price on January 21, 2001 had fallen a single penny below the lower of the two Strike Prices, $3,716.84, the Stechlers would have received no payoff under the Long Option and made no payment under the Short Option, and would thus have received no return on their net investment of $500,000. If the Reference Price was a single penny higher, the Stechlers would have received a net payoff of $140,230,051, as the Long Option paid off but not the Short Option—a 28,000% return on their investment. A further three cent climb in the value of the index would have sent the Stechlers' net payoff plummeting back down to $1,799,995, as the Short Option paid off as well. The remote potential of the 'lottery' payoff of $140 million distinguishes this transaction from a transaction in which offsetting positions are taken in standard options.

118. DGI's Reply Memorandum of Law at 6.

119. *See* Summaries of Daily Values, Ex. A, Tab 2 to Kleinhendler Decl.

120. *See id.*

accuracy of their calculations) how closely the manner in which the "theoretical value" of a Digital Option fluctuates resembles the manner in which the value of a standard option fluctuates. Moreover, it is not clear whether the secondary market for Digital Options is sufficiently thick that the "theoretical value" is reflective of economic reality. Nor is it clear that the particular Digital Options purchased and sold by the Stechlers could be resold. Whether the Digital Options are securities ultimately turns on these issues of fact.[121] This issue is not appropriately resolved on a motion to dismiss.[122]

### 2. The Strategy Involved the Sale of Common Stock

*Second*, defendants argue that the PSLRA bar applies because the Strategy involved transactions in marketable securities. As described above, in order to carry out the Strategy, the Stechlers acquired an interest in the Fund, which was redeemed in exchange for the common stock of seven corporations ("the Common Stock"). The Common Stock, its basis artificially inflated pursuant to the Strategy, was then contributed to Joseph Stechler & Co., which subsequently sold the Common Stock at its fair market value, claiming a loss. This transaction in securities, undertaken in reliance on defendants' represen-

tations concerning the lawfulness of the Strategy, was a key step in the Strategy; had the Stechlers not acquired and sold the Common Stock, they would have had no tax losses.

 The Stechlers argue that there is "at most a tenuous connection" between the Common Stock transactions and the alleged fraud.[123] The Stechlers attempt a 'surgical presentation' of their claims, in which the securities transactions are wholly separate from the allegedly fraudulent tax advice. The Stechlers' Complaint, however, consistently refers to the Strategy as a single, unified product. The Stechlers allege that the defendants marketed the *Strategy*, not the individual steps required to carry it out; in reliance on defendants' representations, the Stechlers entered into the *Strategy*, not a series of unrelated transactions. The Common Stock transactions were a key part of that Strategy.

The Stechlers also argue that the Strategy could have been accomplished without the Common Stock transactions. They observe that "[t]he basis that generated the 'tax loss' in these transactions could just as easily have been attached to furniture, office equipment, livestock or any number of other assets, if there had been as liquid a market for such assets."[124] This argu-

---

**121.** The issue may also depend on the understandings and expectations of the Options' purchasers as to their nature. *Cf. Reves v. Ernst & Young*, 494 U.S. 56, 61, 110 S.Ct. 945, 108 L.Ed.2d 47 (1990) (examining "reasonable expectations of the investing public" to determine whether particular note instruments were securities: "[t]he Court will consider instruments to be 'securities' on the basis of such public expectations, even where an economic analysis of the circumstances of the particular transaction might suggest that the instruments are not 'securities' as used in that transaction"); *Landreth Timber Co. v. Landreth*, 471 U.S. 681, 693, 105 S.Ct. 2297, 85 L.Ed.2d 692 (1985) (relying on public ex-

pectations in holding that common stock is always a security).

**122.** *See Heller v. Deutsche Bank AG*, No. 04 Civ. 3571, 2005 WL 525401, at *4, 2005 U.S. Dist. LEXIS 3445, at *18 (E.D.Pa. Mar. 3, 2005) (denying motion to dismiss RICO claims on basis of PSLRA bar, where there was an issue of fact as to whether certain instruments involved in the tax shelter were 'securities').

**123.** RICO Response at 5.

**124.** *Id.* at 6. This distinguishes the scheme at issue here from that in cases such as *Loftin v.*

ment is unavailing. Perhaps there is a sense in which the Strategy might have been designed differently: but whether an alleged fraud is in connection with a securities transaction cannot be made to turn on whether, hypothetically, the fraud might have been accomplished without the involvement of securities. All that matters is that the alleged fraud which is actually, not hypothetically, before the Court *did* involve securities. The alleged fraud and the Common Stock transactions coincided and were closely and integrally related. The Stechlers' allegations are therefore actionable as securities fraud, and the PSLRA bar requires dismissal of their RICO claims.

There is no diversity in this case, and the Stechlers' RICO claims are their only federal claims. Having dismissed all federal claims, the Court declines to exercise supplemental jurisdiction over the remaining state-law claims.[125] All claims are therefore dismissed without prejudice. The Stechlers are granted leave to amend their complaint to state a claim for securities fraud, if they wish to do so.

## V. CONCLUSION

For the foregoing reasons, DGI's motion to compel arbitration is granted. Brown & Wood's motion to stay or compel arbitration is denied. The Stechlers' complaint is dismissed without prejudice, and the Stechlers are granted leave to amend their complaint to state a claim for securities fraud. The Clerk of the Court is directed

to close these motions [# s 24, 28, 30, 32, 35, 40].

SO ORDERED.

---

*KPMG, LLP*, No. 02 Civ. 81166, 2003 WL 22225621 (S.D.Fla. Sept. 10, 2003) and *Jacoboni v. KPMG, LLP*, 314 F.Supp.2d 1172 (M.D.Fla.2004). In those cases, courts found the PSLRA bar applicable to tax shelters involving securities transactions. The tax shelters at issue in those cases took advantage of particular provisions of the Internal Revenue Code, §§ 318(a)(2)(C) and 318(a)(4). Because the operative language of those provisions

refers specifically to "stock," those tax shelters could not possibly have been carried out without the involvement of securities.

125. *See Rodriguez v. Haynes*, 341 F.Supp.2d 416, 427 (S.D.N.Y.2004) ("When all federal claims are dismissed at an early stage of a case, exercise of supplemental jurisdiction over remaining state law claims is usually inappropriate.").